**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

---

TAYLOR ABSHIRE, individually and on behalf of the unopened succession of Richard Abshire; KAYSI ABSHIRE, individually and on behalf of the unopened succession of Richard Abshire; LINDSEY JOHNSON, as next of friend of E.A. and A.A., individually and on behalf of the unopened succession of Richard Abshire,

    Plaintiffs,

v.

LIVINGSTON PARISH; SHERIFF JASON ARD, as the public entity responsible for Livingston Detention Center; and DR. JAMES TAYLOR, in his individual capacity,

    Defendants.

---

CASE NO. 22-cv-_____

JUDGE _____

MAGISTRATE JUDGE _____

**JURY TRIAL DEMANDED**

## COMPLAINT

Now comes Plaintiff, TAYLOR ABSHIRE, individually and on behalf of the unopened succession of Richard Abshire, KAYSI ABSHIRE, individually and on behalf of the unopened succession of Richard Abshire, and LINDSEY JOHNSON, as next of friend of E.A. and A.A., individually and on behalf of the unopened succession of Richard Abshire, who respectfully aver as follows:

1. This lawsuit arises out of the injury, neglect, abuse, disability-related discrimination, and ultimate death of Richard Abshire while in the custody and care of Defendants at the Livingston Parish Detention Center. Mr. Abshire had cancer that was in remission, but Defendants refused to take necessary steps to care for Mr. Abshire, accommodate Mr. Abshire, or transfer Mr. Abshire to a facility capable of caring for his needs. Moreover, Defendants neglected

1

Mr. Abshire despite explicit instructions from his Tulane-based oncologist, from Mr. Abshire, and from Mr. Abshire's family.

2.  Instead of accommodating Mr. Abshire's needs, it appears that Defendants believed he was "faking" his deteriorating condition. In treating Mr. Abshire's condition with skepticism, Defendants ignored critical warning signs of his deteriorating condition—confusion, soiling himself, headaches, and inability to sleep.

3.  Indeed, Mr. Abshire's family provided Defendants with an FDA-approved medical device that would have helped keep Mr. Abshire's cancer in remission and/or slow its progression. But Defendants steadfastly refused to use it.

4.  On September 11, 2021, Mr. Abshire collapsed in the Livingston Parish Detention Center. The deputies then transported Mr. Abshire to Our Lady of the Lake Hospital ("OLOL").

5.  Incredibly, the deputies failed to adequately secure Mr. Abshire in Defendants' transport vehicle. Upon their arrival to the emergency department, Defendant Ard's personnel opened the door to the vehicle and Mr. Abshire fell out of the vehicle, striking his head on the ground.

6.  On or about November 28, 2021, Mr. Abshire died.

## JURISDICTION AND PARTIES

7.  TAYLOR ABSHIRE is an individual above the age of majority and of sound mind. MS.TAYLOR ABSHIRE is a daughter of the late Mr. Abshire.

8.  MS. TAYLOR ABSHIRE sues individually and on behalf of the unopened succession of Richard Abshire.

9.  MS. KAYSI ABSHIRE is an individual above the age of majority and of sound mind. MS. KAYSI ABSHIRE is a daughter of the late Mr. Abshire.

10. MS. KAYSI ABSHIRE sues individually and on behalf of the unopened succession of Richard Abshire.

11. LINDSEY JOHNSON is an individual above the age of majority and of sound mind. MS. LINDSEY JOHNSON is the aunt of the late Mr. Abshire.

12. E.A. and A.A. are minors who are the children of Mr. Abshire.

13. E.A. and A.A. are being taken care of by LINDSEY JOHNSON, who is in the process of adopting E.A. and A.A.

14. MS. LINDSEY JOHNSON will file a motion for leave to appear as next of friend on behalf of E.A. and A.A.

15. E.A. and A.A., through MS. LINDSEY JOHNSON, seek damages individually and on behalf of the unopened succession of Richard Abshire

16. LIVINGSTON PARISH is sued as a municipal entity. LIVINGSTON PARISH is responsible for adequately funding the prison and providing medical services, equipment, personnel, and developing policies, procedures, and practices related to the medical unit.

17. SHERIFF JASON ARD is sued in his official capacity as the public entity responsible for security and operations of the Livingston Parish Detention Center.

18. DR. JAMES TAYLOR (hereinafter "defendant TAYLOR") is, upon information and belief, the medical doctor appointed by LIVINGSTON PARISH to serve as the physician for the Livingston Detention Center.

19. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331. Specifically, this Court has jurisdiction over Plaintiffs' claim under 42 U.S.C. § 1983 is based on federal law. This Court has jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367 because said claims arise from the same operative facts as Plaintiff's federal law claim.

20. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events that give rise to the claims occurred in this District.

## FACTS

21. In 2021, Mr. Robert Abshire was a resident of, and was domiciled in, Livingston Parish, Louisiana.

22. At that time, Mr. Abshire was an individual with a disability. Specifically, Mr. Abshire had a glioblastoma multiforme tumor.

23. A glioblastoma multiforme tumor invades the nearby brain tissue, but generally does not spread to distant organs.

24. Mr. Abshire was previously diagnosed with this condition in October of 2019, but he received treatment and the cancer was in remission.

25. Mr. Abshire was prescribed by his oncologist an FDA-approved medical device called an Optune (hereinafter the "Optune Device"). Prior to being incarcerated, Mr. Abshire was using the Optune Device.

26. The Optune Device delivers a dose of radiation to the head and is used in combination with the medication Temozolomide ("TMZ").

27. The significant benefit conferred by the Optune Device is established via a statistically valid clinical study. Individuals with cancer that used TMZ medication alone only had a 5% chance of 5-year survival. In contrast, individuals who were a part of the Optune Device arm of the study had a documented 13% chance of 5-year survival.

28. Quite simply, the Optune Device was 260% more effective than monotherapy.

29. Upon information and belief, defendant TAYLOR was appointed by Livingston Parish as the physician for the Livingston Parish Detention Center.

30. Upon information and belief, Livingston Parish contracted for Dr. James Taylor to provide a limited number of hours of service at the Livingston Parish Detention Center. Upon information and belief, Livingston Parish did not contract Dr. James Taylor to provides as many

hours were necessary—24/7 and using as much help as he needed—to provide care for the inmates at the Livingston Parish Detention Center "whenever they are sick."

31. Under Louisiana law, a parish is obligated to appoint a physician who "shall attend the prisoners who are confined in parish jails whenever they are sick." La.R.S. 15:703(A).

32. On or about July 12, 2021, Mr. Abshire arrived at the Livingston Parish Detention Center as a pretrial detainee.

33. Upon information and belief, shortly after his arrival, Mr. Abshire advised the medical staff of his cancer diagnosis and his need for the Optune Device.

34. On July 20, 2021, Mr. Abshire completed a form where he explained that he was in fear for his life:

> "I would like to find out if I'm eligible for compassionate Medical release. I understand it has to go through the warden but I have a terminal illness, lucky to still be alive and do not think I should pay for my actions with my life as I am undergoing periodic MRIs and CT scans. Thank you."

35. That same day, defendant TAYLOR spoke with Mr. Abshire's oncologist from Tulane. The following note is recorded in the medical records:

> "Dr. Taylor spoke with Dr. Trevino (neuro-oncologist) today regarding inmate's medical condition. He reported that inmate needs his Optune Device on at least 15 hours a day. This device delivers radiation to the brain tumor. Inmate's head needs to be shaved every 2-3 days in order for the adhesive waivers to stick to his head.
>
> Inmate reported during the noon pill call that his daughter, Taylor could bring his Optune Device up here for him to begin using. Called inmate's daughter who reported that she would bring it up here sometime today or tomorrow. When the device is received he will need to be rehoused in a holding cell in booking. Inmate will also need to shave his head as it hasn't been shaved in several weeks."

36. The above medical note was recorded in the prison medical records of Mr. Abshire and thus, upon information and belief, was available to all other prison medical personnel interacting with Mr. Abshire.

5

37. Quite simply, by July 20, 2021, defendant TAYLOR and the medical department knew that Mr. Abshire had cancer, needed the Optune Device, knew the duration that the device should be used each day, and knew the method of administration.

38. Defendants never once provided the Optune Device to Mr. Abshire.

39. On July 26, 2021, six days after defendant TAYLOR's communication with Mr. Abshire's oncologist from Tulane, Ms. Courtney Chaney provided a "staff response" to Mr. Abshire. In her response, Ms. Chaney acknowledged that there may be a need to transfer Mr. Abshire to another facility that would be better equipped to treat his condition, stating:

> "There is no such thing as a compassionate medical release. But as we receive more of your medical records, we will possibly be able to see about getting you transferred to another facility that is better able to treat you from a medical standpoint. But that is down the line."

40. On July 30, 2021, Ms. Abshire's daughter brough Mr. Abshire's Optune Device to the prison. According to a medical record, the device was placed "in Med 1 office".

41. Despite receipt of his needed medical device, Defendants did not permit Mr. Abshire to use the life saving device.

42. On August 17, 2021, Mr. Abshire completed another medical form. In this form Mr. Abshire stated:

> "I was told over 2 weeks ago that my Dr. wanted me to have my Optune device while incarcerated. I have not heard another word about this and am worried about my brain tumor returning. I have had in creasing worse headaches and feel I am being ignored and that your medical staff does not care about my health. My family has gone through a lot to get a new device ordered, and I need to have it. I hope your team knows how serious a glioblastoma multiforme tumor is.
>
> Thank you,
>
> Richard Abshire"

43. Despite this urgent plea, Defendants never provided Mr. Abshire with the Optune Device.

44. There is no indication that Mr. Abshire's vitals were assessed.

6

45. Over the course of Mr. Abshire's incarceration, Mr. Abshire's family made daily phone calls to the jail requesting that Mr. Absire receive treatment via the Optune Device. They were told that treatment would not be provided because "the nurse is pregnant" and could not be around the device.

46. Mr. Abshire's family was also told that the medical staff was not providing the device because they "didn't know how to use it." This excuse was baseless, however, because Ms. Taylor Abshire provided the medical staff with the instruction manual.

47. On August 24, the medical staff noted that they were summoned to Mr. Abshire's cell because other inmates alerted that Mr. Abshire "was dizzy and going to pass out."

48. Despite the alert that Mr. Abshire was now suffering from dizziness and was concerned that he would suffer a sudden loss of consciousness, Defendants still did not provide Mr. Abshire with the Optune Device.

49. There is no indication that Mr. Abshire's vitals were assessed.

50. On August 25, Mr. Abshire made a call for medical help. Ms. Joyce Kohler, LPN, arrived at Mr. Abshire's cell. Mr. Abshire advised that "something is seriously wrong," and elaborated, stating that he needed to see his doctor or go to the emergency room, that he hadn't slept in two days, and that he had painful headaches. The nurse argued with Mr. Abshire that he had slept the night before and offered a lackluster apology to Mr. Abshire as to his headache.

51. Mr. Abshire responded by stating "You're sorry? The ibuprofen is not going to help. What's going to happen when I die in here and I sue you?" According to medical record, in response to this statement, Ms. Kohler "advised inmate that after that statement the discussion is over and medical walked out of the dorm."

52. There is no indication that Ms. Kohler investigated Mr. Abshire's concerns that he was dying or reported the situation to her supervisor or defendant TAYLOR.

53. There is no indication that Mr. Abshire's vitals were assessed.

54. On August 25, a further note is included that Mr. Abshire was pressing the emergency call button and stating he had a severe headache and was confused. However, the note

7

clearly indicates skepticism of Mr. Abshire's report of confusion, stating "inmate was not noted to be disoriented at either pill call today."

55. There is no indication that Mr. Abshire's vitals were assessed.

56. On August 28, Mr. Abshire again inquired into why he was not receiving access to the Optune Device. According to the note, "[due to] the pandemic, we are unable to bring anyone in the facility to set it up for him."

57. By September 7, 2021, the medical staff began to document Mr. Abshire's horribly deteriorating condition. Specifically, Ms. Lacey Shelton noted:

> "Inmate's movement has been noticeable slow during pill call. He sits on the bed and shares for about a minute or two before attempting to get up. He appears to be confused and has an unsteady gait, using the bed and wall to ambulate."

58. There is no indication that Mr. Abshire's vitals were assessed.

59. Despite his deteriorating condition, Defendants still did not provide Mr. Abshire with the Optune Device, take him to the hospital, or transfer him to another facility.

60. On September 11, at 8:55 p.m., the medical staff were informed that Mr. Abshire had urinated on himself and that the staff were "cleaning it up."

61. Despite Mr. Abshire being unable to control his urinary functions, other than cleaning up the up the urine, no steps were taken to have Mr. Abshire evaluated by a doctor or to be taken to the hospital.

62. Shortly thereafter, Mr. Abshire was "observed to be passed out on the floor." Based on a review of footage, Mr. Abshire collapsed while walking to obtain a food tray.

63. Medical staff then, finally, assessed Mr. Abshire's vitals. Mr. Abshire had a highly erratic and irregular pulse. A pupil test was performed, and Mr. Abshire could not complete the test. Mr. Abshire's responses to questions were inappropriate to the question posed.

64. Only once in a fully non-responsive state did the medical staff issue an order for Mr. Abshire to be taken to the hospital.

8

65. The Sheriff personnel loaded Mr. Abshire into a transport vehicle and transported him to OLOL.

66. Based on a chart note from OLOL, upon arrival of the transport vehicle to OLOL, "when police transfer crew opened the van door, he rolled out of the vehicle and fell hitting his head on the ground."

67. According to this same chart note, a call was placed to the medical unit at the Livingston Parish Detention Center. This individual reported "that he is supposed to be wearing a radiation helmet. However, they have not been able to provide help with this since he has been in jail (since July)."

68. Eventually, Mr. Abshire was transferred from OLOL to Tulane.

69. Despite the efforts of the doctors and medical staff at OLOL and Tulane, Mr. Abshire's condition failed to improve.

70. On November 28, 2021, Mr. Abshire died.

71. Upon information and belief, Mr. Abshire's suffering and/or death was hastened and/or accelerated by the failures, omissions, and conduct at issue in this case, namely, failure to permit him to use the Optune Device, failure to transfer him to another facility, failure to assess his vitals, failure to issue a code blue, permitting him to walk while disoriented and confused (an obvious fall risk), failing to adequately secure him in the transport vehicle, and failure to safely remove him from the transport vehicle.

72. Alternatively, upon information and belief, the failures, omissions, and conduct at issue in this case at issue in this case deprived Mr. Abshire of the opportunity to potentially live longer, despite his tumor which was in recession upon his incarceration.

73. It would have been feasible and reasonable for Defendants to take steps to ensure that Mr. Abshire's needs were satisfied:

    a. Defendants should have provided Mr. Abshire with the Optune Device—which was within their possession, and they knew how to use.

    b. Defendants should have assessed Mr. Abshire's vitals.

9

    c. Defendants should have transferred Mr. Abshire to another prison or a medical facility capable of providing care to an individual with cancer.

    d. Defendants should have issued code blue alerts as to Mr. Abshire, due to his deteriorating physical condition.

    e. Defendants should have ransferred Mr. Abshire to the hospital at an earlier date.

    f. Defendants should not have permitted Mr. Abshire to walk to get food, after urinating on himself in a disoriented state, despite (a) his open and obvious confusion and (b) failure to assess his vitals.

    g. Defendants should have obtained instructions on the Optune Device from the manufacturer, whether via in person, zoom, or telephone.

    h. Defendants should have not blocked personnel from the Optune Device company to visit due to "COVID protocols."

    i. Defendants should have not denied Mr. Abshire to use the Optune Device because "the nurse was pregnant."

    j. Defendant Ard's personnel failed to adequately secure Mr. Abshire in the transport vehicle.

    k. Defendant Ard's personnel failed to assess Mr. Absire prior to opening the door.

### COUNT I: NEGLIGENCE, WRONGFUL DEATH, AND SURVIVAL
### (As to Livingston Parish and Sheriff Ard)

74. Livingston and Sheriff Ard each had different duties to Mr. Abshire.

75. Defendants' breach of their respective duties caused or contributed to the injuries/losses that are at issue in this case.

76. The injuries at issue in this case were proximately and legally caused by Defendants and were a foreseeable result of Defendants' failure to comply with their duties.

77. Plaintiffs' claims of negligence, wrongful death, and survival are delineated by defendant.

*As to Livingston Parish*:

78. Defendant Livingston Parish was obligated to appoint a physician to provide care for the inmates at the Livingston Parish Detention Center "whenever they are sick."

79. Upon information and belief, Livingston Parish only entered into a contract with defendant TAYLOR as to a limited number of hours per week or month. As such, inmates were not able to see a physician "whenever they are sick."

80. As such, Livingston Parish breached its obligation to Mr. Abshire.

81. Upon information and belief, Livingston Parish either directly, or in collaboration with Defendant Ard, developed the policies and procedures for permitting outside persons to enter the facility. This policy or procedure was used as a pretext or basis by the medical staff for not obtaining purportedly necessary in-person instructions on usage of the Optune Device.

82. Livingston Parish had a duty to ensure that the policies/procedures it developed contained exceptions to permit necessary outside personnel to visit or to make reasonable exceptions so that said policies or procedures would not cause unnecessary harm to inmates.

83. By refusing to bring in outside personnel to aid with the usage of the Optune Device—purportedly based on the stringent policy—Livingston Parish breached its duty to Plaintiff.

84. Upon information and belief, Livingston Parish was the employer of the nurses and medical supervisors discussed above.

85. The nurses and medical supervisors discussed above were negligent by:

   a. Failing to check Mr. Abshire's vitals after Mr. Abshire reported serious medical developments or it was open and obvious Mr. Abshire needed to be assessed.

   b. Refusing to permit Mr. Abshire to use the Optune Device.

   c. Failing to call a code blue.

   d. Failing to initiate steps to transfer Mr. Abshire to a medical facility or another correctional facility with the staffing or training needed to administer the Optune Device.

   e. Failing to report Mr. Abshire's deteriorating condition to defendant TAYLOR.

11

  f. Failing to take steps to challenge or override defendant TAYLOR's grossly inadequate and/or malicious decision not to administer the Optune Device.

  g. Permitting Mr. Abshire to walk unaided despite his open and obvious confusion and disorientation, which clearly evidenced that he was a fall risk.

86. Pursuant to the doctrine of *respondeat superior*, Livingston Parish is liable to Plaintiffs for the breach of duties by the employees/agents/contractors of the medical department.

<u>As to Defendant Ard:</u>

87. Upon information and belief, Defendant Ard's staff knew or should have known of Mr. Abshire's deteriorating condition.

88. Upon information and belief, Defendant Ard's staff or should have known that Mr. Abshire needed the Optune Device and that the medical staff were failing to administer said device.

89. Upon information and belief, Defendant Ard's staff should have known that Mr. Abshire needed to be transferred to another facility because the medical staff at the Livingston Parish Detention Center were incapable of providing cancer care to an oncology patient.

90. Upon information and belief, despite knowing or having constructive knowledge of Mr. Abshire's deteriorating condition and the failing of the medical staff, Defendant Ard's employees did not attempt to transfer Mr. Abshire to a medical facility or another correctional facility with the staffing or training needed to administer the Optune Device.

91. Upon information and belief, Defendant Ard either directly, or in collaboration with the medical staff, developed the policies and procedures for permitting outside persons to enter the facility. This policy or procedure was used as a pretext or basis by the medical staff for not obtaining purportedly necessary in-person instructions on usage of the Optune Device.

92. Defendant Ard had a duty to ensure that the policies/procedures it developed contained exceptions to permit necessary outside personnel to visit or to make reasonable exceptions so that said policies or procedures would not cause unnecessary harm to inmates.

93. Defendant Ard's staff also had a duty, when transporting inmates, to ensure that they were secured in the transport vehicle in a safe manner.

94. Defendant Ard's staff also had a duty, when transporting inmates, to ensure that opening the vehicle could be done in a safe manner without injuring the inmate.

95. When the door to the vehicle transporting Mr. Abshire to OLOL was opened, Mr. Abshire fell out of the vehicle and struck his head on the floor.

96. Pursuant to the doctrine of *respondeat superior*, Defendant Ard is liable to Plaintiffs for the negligence of its employees that (a) failed to take steps to transfer Mr. Abshire to another facility; (b) developed and/or enforced the overly restrictive entrance restrictions; and (c) failed to safely and reasonable restrain Mr. Abshire in the transport vehicle and failed to safely remove Mr. Abshire from the transport vehicle.

## COUNT II: THE LOUISIANA HUMAN RIGHTS ACT
### (La. R.S. § 51:2231 et. seq. ("LCHR"))
### (As to Livingston)

97. Plaintiffs repeat and reallege all preceding paragraphs in support of this claim.

98. At all times relevant to this action, the Louisiana Commission on Human Rights, LA. REV. STAT. ANN. § 51:2231 et. seq., (hereafter "LCHR") has been in full force and effect and has applied the conduct of Defendants.

99. At all times relevant to this action, Mr. Abshire experienced substantial limitations to several major life activities and was an individual with a disability within the meaning of LCHR, LA. REV. STAT. ANN. § 51:2232(3)(a).

100. At all times relevant to this action, Livingston qualified as a place of public accommodation as defined by LA. REV. STAT. ANN. § 51:2232(9) by virtue of having been supported directly or indirectly by government funds.

101. The LCHR prohibits discriminatory practices and provides that "it is a discriminatory practice for a person to deny an individual the full and equal enjoyment of goods, services, facilities, privileges, advantages, and accommodations of a place of public

accommodation, resort, or amusement . . . on the grounds of . . . disability." LA. REV. STAT. ANN. § 51:2247.

102. The LCHR extends relief to "[a]ny person deeming himself injured by" discrimination in violation thereof. LA. REV. STAT. ANN. § 51:2264.

103. Livingston discriminated against Plaintiff on the basis of disability, in violation of LA. REV. STAT. ANN. § 51:2247, by failing to adjust to Plaintiff's unique, disability-related needs. Under the circumstances, Plaintiff had a need to use the Optune Device. This is equivalent to how a deaf individual may need to use an American Sign Language Interpreter (or other auxiliary aid) or a paraplegic may need to use a wheelchair.

104. Mr. Abshire expressly requested that he be provided the Optune Device, but this request was never satisfied.

105. Given the circumstances, and given Mr. Abshire's disability, his need for the Optune Device as a reasonable modification that was open, obvious, and readily apparent to Livingston. Additionally, Livingston had an affirmative obligation to ensure that Mr. Abshire's disability-related needs were being satisfied.

106. Livingston failed to provide the necessary accommodations / modifications, as is evidenced by the fact that Mr. Abshire deteriorated while in Livingston's care and custody.

107. Plaintiffs deem themselves and/or Mr. Abshire injured by Livingston's conduct and sue under the LCHR to recover compensatory damages for the injuries and loss sustained as a result of Livingston's discriminatory conduct.

108. Plaintiffs are further entitled to an award of attorneys' fees, costs, and disbursements pursuant to the LCHR, LA. REV. STAT. ANN. § 51:2264.

## COUNT III: 42 U.S.C. § 1983

### (As to Dr. James Taylor)

109. Plaintiffs repeat and reallege all preceding paragraphs in support of this claim.

110. As is set forth above in the factual narrative, defendant TAYLOR, acting

individually and under color of law, engaged in a course of conduct that deprived Mr. Abshire of his Constitutional rights, specifically, the right to reasonable and adequate medical and the right to be free from punishment without due process as protected by the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983, ultimately resulting in his death.

111. As is set forth above, Defendant TAYLOR refused to treat Mr. Abshire's cancer and intentionally refused to provide a necessary medical device that was at the Livingston Parish Detention Center. Defendant TAYLOR knew that Mr. Abshire needed access to the Optune Device—as specifically directed by Mr. Abshire's oncologist—but defendant TAYLOR did not provide Mr. Abshire with access to the essential medical device.

112. Defendant TAYLOR was deliberately indifferent in the following regards

- Failing to provide necessary reasonable accommodation to Mr. Abshire, an individual with a disability, as necessary to avoid violation of pretrial detainees' Fourteenth Amendment right to an adequate condition of confinement.

- Failing to provide Mr. Abshire with necessary and minimally adequate medical care and treatment.

- Failing to provide Mr. Abshire with necessary and minimally adequate pharmacological care and treatment.

- Failing to provide Mr. Abshire with a necessary medical device that was possessed at the facility.

- Routinely, as a matter of practice, failing to provide Mr. Abshire with necessary emergency care, emergency response, and emergency out-patient treatment.

- Failing to transfer Mr. Abshire to another facility that was capable of providing for Mr. Abshire.

- Depriving Mr. Abshire of needed medications and treatment.

- Ignored critical warning signs of Mr. Abshire deteriorating condition—confusion, headaches, and inability to sleep.

113. At all times pertinent herein, defendant TAYLOR acted unreasonably, recklessly, maliciously, and/or with deliberate indifference and disregard for the constitutional and civil rights and life and serious medical needs of Mr. Abshire, ultimately facilitating and/or accelerating his death.

114. Furthermore, defendant TAYLOR had the duty and ability to intervene to prevent the violations of the rights of Mr. Abshire, as described herein, but failed to do so, ultimately facilitating and/or accelerating his death.

115. Defendant TAYLOR knew he was providing inadequate supervisory care, medical care, deprivation of a medical device, and emergency care to Mr. Abshire, ultimately facilitating and/or accelerating his death.

116. Defendant TAYLOR knew or should have known that his conduct was objectively unreasonably and violated clearly established law.

117. Defendant TAYLOR took action knowingly and intentionally, or with reckless disregard for to Mr. Abshire's Constitutional rights.

118. Defendant TAYLOR's conduct evinced an intentional, malicious, and/or reckless disregard of the health, safety, or rights of to Mr. Abshire. Moreover, Mr. Abshire was an individual with a disability and thus was especially vulnerable. Thus, an award of punitive damages would be appropriate against defendant TAYLOR.

## DAMAGES SOUGHT

119. By and through their conduct, Defendants caused significant damages and injuries to Mr. Abshire and Plaintiffs. Plaintiffs seeks to recover the following damages:

   a. The emotional distress, pain and suffering, and humiliation suffered by Mr. Abshire prior to his death.

   b. Physical bodily injury suffered by Mr. Abshire.

   c. Damages for the discrimination related injuries suffered by Mr. Abshire.

   d. Survival damages to each named Plaintiff for inability to spend further time with their father.

   e. Nominal damages under the LCHR to vindicate Mr. Abshire's civil rights.

   f. Solely as to defendant TAYLOR, punitive damages.

   g. Legal interest on all of the above.

   h. All other damages that are available at law.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury for all issues triable by jury under law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays that:

   A. This Court award compensatory or actual damages, legal interest, and costs against Defendants Livingston and Ard for negligence, wrongful death, and survival;

   B. This Court award monetary damages (compensatory, nominal, and punitive) for the harm caused by defendant TAYLOR's Constitutional

17

violations, pursuant to § 1983;

C. Actual, compensatory, and nominal against Livingston under the LCHR;

D. Attorneys' fees and costs (including expert expenses) against Livingston under the LCHR;

E. Reasonable attorneys' fees, costs and litigation expenses against defendant TAYLOR's pursuant to § 1983;

F. Such other relief as the Court deems just and proper, and/or is allowable under the law.

Respectfully Submitted,

**BIZER & DEREUS, LLC**
*Attorneys for Plaintiff*

/s/Andrew D. Bizer
ANDREW D. BIZER (LA # 30396)
GARRET S. DEREUS (LA # 35105)
EMILY A. WESTERMEIER (LA # 36294)
3319 St. Claude Ave.
New Orleans, LA 70117
T: 504-619-9999; F: 504-948-9996
Email: ewest@bizerlaw.com
        andrew@bizerlaw.com
        gdereus@bizerlaw.com