# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

TAYLOR ABSHIRE, INDIVIDUALLY
AND ON BEHALF OF THE UNOPENED
SUCCESSION OF RICHARD ABSHIRE,
ET AL.

                                 CIVIL ACTION

VERSUS

                                 NO. 22-548-JWD-SDJ

LIVINGSTON PARISH, ET AL.

## RULING AND ORDER

I.    **INTRODUCTION**

Before the Court is the *Motion to Dismiss, Pursuant to* FRCP Rules 12(b)(6) *and* 12(b)(1)*, for Failure to State a Claim Upon Which Relief Can Be Granted and Lack of Subject Matter Jurisdiction* ("*Motion to Dismiss*"), (Doc. 5), filed by Defendant Livingston Parish ("Livingston" or the "Parish"). Plaintiffs Taylor Abshire, Kaysi Abshire, and Lindsey Johnson, all individually and on behalf of the unopened succession of Richard Abshire, and Lindsey Johnson as next of friend of E.A. and A.A., (collectively, "Plaintiffs"), oppose the motion, (Doc. 10). Livingston has filed a reply, (Doc. 16). Oral argument is not necessary.

On August 11, 2022, Plaintiffs, daughters of Robert Abshire, filed suit against the Parish, Sheriff Jason Ard, and Dr. James Taylor (collectively, "Defendants") following Mr. Abshire's tragic death while in Livingston Parish Detention Center ("LPDC"). In sum, Plaintiffs allege that Mr. Abshire was denied a life-saving medical device—an Optune—which his family tried to provide to Defendants, and which would have reduced the risk of his dying of cancer. Plaintiffs assert the following causes of action: (1) Negligence, Wrongful Death, and Survival (as to Livingston and Sheriff Ard); (2) violations of the Louisiana Human Rights Act, La. Rev. Stat. §

51:2231 *et seq.* ("LHRA") (as to Livingston); and (3) deliberate indifference and denial of medical care in violation of the Fourteenth Amendment under 42 U.S.C § 1983 (as to Dr. Taylor). (*See* Complaint, Doc. 1.)

Each defendant seeks dismissal of Plaintiffs' claims,[1] but this *Motion to Dismiss* involves only the Parish's.  In sum, Livingston's motion rests on two grounds: (1) that Plaintiffs have failed to exhaust their administrative remedies under the Louisiana Prison Litigation Reform Act, La. Rev. Stat. § 15:1181 *et seq.* ("Louisiana PLRA"); and (2) that, even if they had, Plaintiffs have failed to state viable claims under the LHRA.

Plaintiffs oppose dismissal.  First, Plaintiffs assert that, by its plain language, the Louisiana PLRA applies only to prisoners, not to survivors and wrongful death beneficiaries like Plaintiffs. Second, Plaintiffs maintain that the Court should look to the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, ("ADA") for guidance in interpreting the LHRA, and, in doing so, the Court should find that Plaintiffs have sufficiently pled (1) a disability—i.e., cancer; and (2) that Mr. Abshire was denied a reasonable modification for that disability—i.e., his Optune Device.

After carefully considering the law, the allegations of the *Complaint* (Doc. 1), and the arguments of the parties, the Court finds that Plaintiffs have the better arguments.  In short, Plaintiffs as non-prisoner survivors and beneficiaries did not need to exhaust administrative remedies under the Louisiana PLRA, and they stated cognizable claims under the LHRA. Consequently, the *Motion to Dismiss* will be denied.

---

[1] Specifically, aside from the instant motion, Dr. Taylor has filed a separate motion to dismiss, (Doc. 14), and Sheriff Ard has filed a motion for summary judgment, (Doc. 23).

## II.    RELEVANT FACTUAL BACKGROUND

### A.  Mr. Abshire's Medical Condition and Needed Device

In October 2019, Mr. Abshire was diagnosed with a glioblastoma multiforme tumor, a cancer that invades nearby brain tissue but generally does not spread to distant organs. (Doc. 1 at ¶¶ 22–24.) By 2021, Mr. Abshire, a domiciliary of Livingston Parish, had received treatment, and his cancer was in remission. (*Id.* at ¶¶ 21, 24.)

Mr. Abshire's oncologist's prescribed Mr. Abshire an Optune, an FDA-approved medical devices which, prior to incarceration, Mr. Abshire was using. (*Id.* at ¶ 25.) An Optune Device "delivers a dose of radiation to the head and is used in combination with the medication Temozolomide" and is "260% more effective than monotherapy." (*Id.* at ¶¶ 26, 28.) As Plaintiffs allege in their *Complaint*,

> The significant benefit conferred by the Optune Device is established via a statistically valid clinical study. Individuals with cancer that used TMZ medication alone only had a 5% chance of 5-year survival. In contrast, individuals who were a part of the Optune Device arm of the study had a documented 13% chance of 5-year survival.

(*Id.* at ¶ 27.)

### B.  Mr. Abshire's Arrival at LPDC and Defendants' Knowledge of His Medical Condition

Mr. Abshire arrived at LPDC on or about July 21, 2021, as a pretrial detainee. (*Id.* at ¶ 32.) Under La. Rev. Stat. § 15:703(A), LPDC must have a physician who "shall attend [to] the prisoners who are confined in parish jails whenever they are sick." (*Id.* at ¶ 31.) Livingston Parish contracted Dr. James Taylor to be LPDC's physician who would provide medical care to the inmates "whenever they are sick." (*Id.* at ¶¶ 29–30.)

3

Upon his arrival to LPDC, Mr. Abshire relayed to medical staff that he needed an Optune Device because of his cancer diagnosis. (*Id.* at ¶ 33.) In a form he filled out on July 20, 2021, Mr. Abshire, in fear for his life, explained the following:

> I would like to find out if I'm eligible for compassionate Medical release. I understand it has to go through the warden[,] but I have a terminal illness, lucky to still be alive[,] and do not think I should pay for my actions with my life as I am undergoing periodic MRIs and CT scans. Thank you.

(*Id.* at ¶ 34.) Dr. Taylor spoke with Mr. Abshire's oncologist from Tulane that same day and thereafter recorded the following message in Mr. Abshire's medical records:

> Dr. Taylor spoke with Dr. Trevino (neuro-oncologist) today regarding inmate's medical condition. He reported that inmate needs his Optune Device on at least 15 hours a day. This device delivers radiation to the brain tumor. Inmate's head needs to be shaved every 2-3 days in order for the adhesive waivers to stick to his head. Inmate reported during the noon pill call that his daughter, Taylor[,] could bring his Optune Device up here for him to begin using. Called inmate's daughter who reported that she would bring it up here sometime today or tomorrow. When the device is received he will need to be rehoused in a holding cell in booking. Inmate will also need to shave his head as it hasn't been shaved in several weeks.

(*Id.* at ¶ 35.) Since this message was recorded in Mr. Abshire's medical records, the note was available to all prison medical personal who interacted with Mr. Abshire. (*Id.* at ¶ 36.) Thus, Plaintiffs allege that "by July 20, 2021, defendant [Dr. Taylor] and the medical department knew that Mr. Abshire had cancer, needed the Optune Device, knew the duration that the device should be used each day, and knew the method of administration." (*Id.* at ¶ 37.) Despite this knowledge, Dr. Taylor did not provide Mr. Abshire with an Optune Device. (*Id.* at ¶ 38.)

Six days after Dr. Taylor communicated with Mr. Abshire's oncologist from Tulane, Ms. Courtney Chaney gave a "staff response" to Mr. Abshire on July 26, 2021, in which she acknowledged the potential need to transfer him to a facility better equipped to treat his condition:

4

> There is no such thing as a compassionate medical release. But as we receive more of your medical records, we will possibly be able to see about getting you transferred to another facility that is better able to treat you from a medical standpoint. But that is down the line.

 (*Id.* at ¶ 39.) Mr. Abshire's daughter brought her father his Optune Device to LPDC on July 30, 2021; however, LPDC did not give Mr. Abshire the device. (*Id.* at ¶¶ 40–41.) Mr. Abshire then expressed the following in an August 17, 2021, medical form:

> I was told over 2 weeks ago that my Dr. wanted me to have my Optune device while incarcerated. I have not heard another word about this and am worried about my brain tumor returning. I have had in creasing [sic] worse headaches and feel I am being ignored and that your medical staff does not care about my health. My family has gone through a lot to get a new device ordered, and I need to have it. I hope your team knows how serious a glioblastoma multiforme tumor is. Thank you, Richard Abshire.

(*Id.* at ¶ 42.) Despite this request, Defendants did not give Mr. Abshire his Optune Device nor was there evidence that they assessed his vitals.  (*Id.* at ¶¶ 43–44.)

Mr. Abshire's family called LPDC on a daily basis requesting that the Optune Device be made available to Mr. Abshire but was told (1) that the device was not made available to Mr. Abshire because LPDC "didn't know how to use it" despite having an instruction manual; and (2) that a pregnant nurse at the facility could not be around the device. (*Id.* at ¶¶ 45–46.)

### C.  Mr. Abshire's Deteriorating Condition

On August 24, 2021, other inmates alerted medical staff that Mr. Abshire "was dizzy and going to pass out." (*Id.* at ¶ 47.)  Despite this, medical staff did not give Mr. Abshire the Optune Device nor assess his vitals. (*Id.* at ¶¶ 48–49.)

The following day on August 25, 2021, Mr. Abshire requested medical assistance. (*Id.* at ¶ 50.) When Ms. Joye Kohler, LPN, arrived in his cell, Mr. Abshire alerted her that "something [was] seriously wrong," namely that (1) "he needed to see his doctor or go to the emergency room";

(2) "he hadn't slept in two days"; and (3) "he had painful headaches." (*Id.*) Ms. Kohler and Mr. Abshire then had a verbal altercation regarding Mr. Abshire's headaches and whether he had been sleeping. (*Id.* at ¶¶ 50–51.) During this altercation, Mr. Abshire expressed concern that he was going to die while at LPDC. (*Id.* at ¶ 51.) There is no indication that Ms. Kohler assessed Mr. Abshire's vitals while at his cell or that she reported Mr. Abshire's concerns about dying to Dr. Taylor. (*Id.* at ¶¶ 52–53.)

Later that day, Mr. Abshire pressed the emergency call button complaining of severe headaches and confusion. (*Id.* at ¶ 54.) However, skeptical of Mr. Abshire's report of confusion, medical staff noted that "inmate was not noted to be disoriented at either pill call today," and Mr. Abshire's vitals were not assessed. (*Id.* at ¶¶ 54–55.)

Following this incident, on August 28, 2021, Mr. Abshire further inquired into why he did not have access to his Optune Device, and LPDC expressed in a note that "[due to] the pandemic, we are unable to bring anyone in the facility to set it up for him." (*Id.* at ¶ 56 (alteration in original).)

On September 7, 2021, medical staff, specifically Ms. Lacy Shelton, began documenting the deterioration of Mr. Abshire's condition:

> Inmate's movement has been noticeable [sic] slow during pill call. He sits on the bed and shares [sic] for about a minute or two before attempting to get up. He appears to be confused and has an unsteady gait, using the bed and wall to ambulate.

(*Id.* at ¶ 57.) Following Ms. Shelton's note, nothing indicates that Mr. Abshire's vitals were assessed or that Defendants provided him the Optune Device, took him to a hospital, or transferred him to another facility.  (*Id.* at ¶¶ 58–59.)

### D.  Mr. Abshire's Death

On September 11, 2021, at 8:55 p.m., medical staff was alerted that Mr. Abshire urinated himself. (*Id.* at ¶ 60.) However, Mr. Abshire was not taken to the hospital or assessed by a doctor.

(*Id.* at ¶ 61.) Soon thereafter, he was found to be "passed out on the floor." (*Id.* at ¶ 62.) Footage from LPDC reveals that "Mr. Abshire collapsed while walking to obtain a food tray." (*Id.*) It was not until then that medical staff assessed Mr. Abshire's vitals to discover that he had an irregular and highly erratic pulse. (*Id.* at ¶ 63.) Further, he could not complete a pupil test, and he would respond in an inappropriate fashion to questions posed of him. (*Id.*) At that point, LPDC's medical staff ordered that Mr. Abshire be taken to the hospital. (*Id.* at ¶ 64.)

Sheriff personnel transported Mr. Abshire to Our Lady of the Lake Hospital, and upon arrival to the hospital "when police transfer crew opened the van door, [Mr. Abshire] rolled out of the vehicle and fell hitting his head on the ground." (*Id.* at ¶¶ 65–66.) Medical staff at Our Lady of the Lake contacted LPDC's medical unit, and after doing so, Our Lady of the Lake noted in Mr. Abshire's medical file "that he is supposed to be wearing a radiation helmet. However, they have not been able to provide help with this since he has been in jail (since July)." (*Id.* at ¶ 67.) Mr. Abshire was transferred to Tulane Hospital, but his condition failed to improve. (*Id.* at ¶¶ 68–69.) He died on November 28, 2021. (*Id.* at ¶ 70.)

## III.   MOTION TO DISMISS: FAILURE TO EXHAUST

### A.  Rule 12(b)(1) Standard

In a Rule 12(b)(1) motion, a party may raise the defense of lack of subject matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1).  "Under Rule 12(b)(1), a claim is 'properly dismissed for lack of subject-matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate' the claim." *In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*, 668 F.3d 281, 286 (5th Cir. 2012) (quoting *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998)).

"The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (citing *McDaniel v. United States*, 899 F. Supp. 305, 307 (E.D. Tex. 1995)). "Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist." *Id.* (citing *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir.1980)). But, "[a] motion under 12(b)(1) should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle him to relief." *Home Builders Ass'n of Miss., Inc.*, 143 F.3d at 1010; *see also Ramming*, 281 F.3d at 161 (citing *Home Builders Ass'n of Miss., Inc.* with approval).

"When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." *Ramming*, 281 F.3d at 161. "Moreover, when a complaint could be dismissed for both lack of jurisdiction and failure to state a claim, 'the court should dismiss only on the jurisdictional ground under [Rule] 12(b)(1), without reaching the question of failure to state a claim under [Rule] 12(b)(6).' " *Crenshaw-Logal v. City of Abilene*, 436 F. App'x 306, 308 (5th Cir. 2011) (alterations in original) (quoting *Hitt v. City of Pasadena*, 561 F.2d 606, 608 (5th Cir. 1977) (per curiam)). "This practice prevents courts from issuing advisory opinions." *Id.* (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998)). "This requirement [also] prevents a court without jurisdiction from prematurely dismissing a case with prejudice." *Ramming*, 281 F.3d at 161 (citing *Hitt*, 561 F.2d at 608).

There are two forms of Rule 12(b)(1) challenges to subject matter jurisdiction: "facial attacks" and "factual attacks." *See Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981). "A facial attack consists of a Rule 12(b)(1) motion unaccompanied by supporting evidence that challenges the court's jurisdiction based solely on the pleadings." *Harmouche v. Consulate*

*General of the State of Qatar*, 313 F. Supp. 3d 815, 819 (S.D. T2018) (citing *Paterson*, 644 F.2d at 523). In considering a "facial attack," the court "is required merely to look to the sufficiency of the allegations in the complaint because they are presumed to be true. If those jurisdictional allegations are sufficient the complaint stands." *Paterson*, 644 F.2d at 523. Whereas, "[a] factual attack challenges the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings—such as testimony and affidavits—may be considered." *Harmouche*, 313 F. Supp. 3d at 819 (citing *Paterson*, 644 F.2d at 523). The "court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981) (citation omitted). "[N]o presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Id.* When a factual attack is made, the plaintiff, as the party seeking to invoke jurisdiction, must "submit facts through some evidentiary method and . . . prov[e] by a preponderance of the evidence that the trial court does have subject matter jurisdiction." *Paterson*, 644 F.2d at 523.

### B. Parties' Arguments

#### *1. Livingston's Original Memorandum (Doc. 5-1)*

The Parish argues that the damages Plaintiffs seek from their causes of action are essentially survival action damages. (Doc. 5-1 at 1.) Likewise, Plaintiffs' claims are Louisiana state law claims. (*Id.*) Thus, under the Louisiana PLRA, Mr. Abshire and/or Plaintiffs must exhaust all administrative remedies prior to filing suit in this Court. (*Id.* at 1–2.) Livingston contends that Mr. Abshire failed to do so and asserts that Plaintiffs made no such allegations that Mr. Abshire exhausted administrative remedies. (*Id.*) Therefore, says Livingston, since Mr. Abshire and

Plaintiffs failed to exhaust all administrative remedies before filing in this Court, this Court should dismiss Plaintiffs' claims. (*Id.*)

The Parish explains how the Louisiana PLRA is modeled after the Federal Prison Litigation Reform Act, 42 U.S.C § 1997 *et seq.* ("Federal PLRA"). (*Id.* at 2.) The Federal PLRA "prohibits any court from entertaining any action brought under § 1983, or any other federal law, until administrative remedies are exhausted." (*Id.*) Further, administrative exhaustion under the Federal PLRA is mandatory and cannot be circumvented even if administrative remedies cannot provide the relief requested. (*Id.*) The Parish contends that these requirements under the Federal PLRA are "nearly identical" to those of the Louisiana PLRA. (*Id.*) Under the Louisiana PLRA, exhaustion of administrative remedies is mandatory before filing suit in a trial court, and "survival and wrongful death claims constitute civil actions with respect to prisons conditions under La. R.S. 15:1181 (2) of the Prison Litigation Reform Act." (*Id.* at 3 (internal quotations omitted) (citing *Kent v. State Through Dep't of Pub. Safety & Corr.*, 2014-1010 (La. App. 1 Cir. 9/23/14), 2014 WL 12569755, at *1, *writ denied*, 2014-2221 (La. 1/9/15), 157 So. 3d 1107)).) Further, failure to exhaust administrative remedies deprives a trial court of subject matter jurisdiction. (*Id.*) Thus, under the Louisiana PLRA, a trial court must dismiss a plaintiff's suit if that plaintiff failed to exhaust all administrative remedies before filing suit. (*Id.*)

The Parish further asserts that LPDC does not qualify as a Louisiana Department of Corrections facility. (*Id.* at 4.) Louisiana Department of Corrections facilities are subject to the administrative procedures set forth in La. Admin. Code tit. 22, pt. I, § 325. (*Id.*) Since LPDC is a parish facility rather than a Louisiana Department of Corrections facility, it is statutorily allowed to set its own procedures for receiving, disposing, and hearing adult or juvenile offenders' grievances and complaints. (*Id.*) Therefore, Plaintiffs' claims are subject to LPDC's own three-

step administrative grievance process set forth in Policy No. F-160 of LPDC's Policies and Procedures Manual. (*Id.* at 4–5.) When arrestees are booked into LPDC, they are given an Inmate Handbook that details LPDC's Inmate Grievance Process. (*Id.* at 5.) Pursuant to this process, inmates must first file an Inmate Grievance Form or other written complaint to the facility that a First Respondent then reviews. (*Id.*) Inmates not satisfied with the First Respondent's response may seek a second level of review of their grievance from the Warden. (*Id.*)  If not satisfied with the Warden's response, inmates may seek a third level of review from the Sheriff. (*Id.*)

The Parish contends that strict compliance with these administrative procedures is required, and, thus, Mr. Abshire's concerns he filled out on one of his medical forms is not a sufficient exhaustion of administrative remedies. (*Id.* at 5–6.) While Mr. Abshire did receive a "staff response" to the concerns he filled out on one his medical forms, he did not proceed to Step Two and get review from the Warden and to Step Three and get review from the Sheriff. (*Id.*) Livingston argues that it is not until Steps Two and Three are taken that administrative remedies can be exhausted (*Id.* at 6.) Therefore, since Mr. Abshire failed to exhaust the proper administrative remedies, this Court lacks subject matter jurisdiction over the matter and must dismiss Plaintiffs' claims without prejudice. (*Id.* at 8.)

### *2. Plaintiffs' Opposition (Doc. 10)*

Plaintiffs respond that this Court should not dismiss their claims because they are not "prisoners" subject to the Louisiana PLRA's administrative-exhaustion requirement. (Doc. 10 at 1–2.) Under the Louisiana PLRA, "administrative remedies are written policies for 'receiving, addressing, and resolving *claims by prisoners*.' " (*Id.* at 4 (quoting La. Rev. Stat. § 15:1184(A)(1)(a)).) Further, the Louisiana PLRA defines "prisoner" as "an individual who is incarcerated, [detained], or admitted 'to any prison who is accused of, convicted of, sentenced for,

or adjudicated delinquent for a violation of criminal law or the terms or conditions of parole, probation, pretrial release, or a diversionary program.' " (*Id.* (quoting La. Rev. Stat. § 15:1181(6)).) As per Louisiana statutory interpretation, a plain reading of the Louisiana PLRA provides that Plaintiffs do not meet the Louisiana PLRA's definition of prisoner. (*Id.* at 5.) Thus, they were not required under the Louisiana PLRA to exhaust administrative remedies before filing suit in this Court. (*Id.*)

To further support their assertion that they are not "prisoners" under the Louisiana PLRA subject to the Act's administrative-exhaustion requirement, Plaintiffs note how survival and wrongful death causes of action are wholly created by the legislature, and a wrongful death cause of action is a survivor's personal action distinct from the primary victim's injuries, which arises at the time of the death of the decedent. (*Id.* at 5–6.) Likewise, a decedent's survivors do not constitute "prisoners" under the Federal PLRA, and there are no Louisiana PLRA cases holding that a decedent's survivors constitute "prisoners" for purposes of the Act's administrative-exhaustion requirement.  (*Id.* at 6–7.) Rather, Defendants can only point to an unpublished opinion which states that wrongful death and survival actions are "civil actions with respect to prison conditions." (*Id.* at 7 (citing *Kent*, 2014 WL 12569755, at *1 (internal quotations omitted)).) Plaintiffs maintain that for practical reasons, a decedent's survivors cannot be required to partake in administrative-exhaustion requirements because, since they were never imprisoned, they would not know the proper administrative processes to go through. (*Id.* at 6.)

### 3. The Parish's Reply Memorandum (Doc. 16)

In response to Plaintiffs' arguments, Livingston contends that despite federal authority saying that a decedent's survivors are not "prisoners" under the Federal PLRA, Louisiana courts have made clear that "survival and wrongful death claims constitute civil actions with respect to

prison conditions, under La. R.S. [15:1184(F)] . . . ." (Doc. 16 at 2 (internal quotations omitted) (citing *Williams v. LaSalle Corr. Ctr. L.L.C.*, 51,260 (La. App. 2 Cir. 4/5/17), 217 So. 3d 1219, 1226; *Kent*, 2014 WL 12569755, at \*1).) Further, the Louisiana Second Circuit Court of Appeal has applied the Louisiana PLRA when a decedent's survivors brought wrongful death and survival actions. (*Id.*) Although there are federal cases to the contrary as it relates to the Federal PLRA, this Court is bound to follow Louisiana jurisprudence on this issue as to whether the Louisiana PLRA applies to a decedent's descendants bringing forth wrongful death and survival claims. (*Id.*)

### C. Law and Analysis

"When adjudicating claims for which state law provides the rules of decision, we are bound to apply the law as interpreted by the state's highest court." *Barfield v. Madison Cnty., Miss.*, 212 F.3d 269, 271–72 (5th Cir. 2000) (citing *Transcontinental Gas v. Transportation Ins. Co.*, 953 F.2d 985, 988 (5th Cir. 1992)). "If the state's highest court has not spoken on the particular issue, 'it is the duty of the federal court to determine as best it can, what the highest court of the state would decide.' " *Id.* (quoting *Transcontinental Gas*, 953 F.2d at 988). Thus, "[o]ur task is to determine as best we can how the Louisiana Supreme Court would decide it." *Jorge-Chavelas v. La. Farm Bureau Cas. Ins. Co.*, 917 F.3d 847, 850 (5th Cir. 2019) (cleaned up).

As Plaintiffs have correctly noted in their opposition, there are no Louisiana Supreme Court cases directly addressing the issue of whether the Louisiana PLRA's exhaustion requirement applies to a decedent's descendants who bring wrongful death and survival claims. (Doc. 10 at 7.) Thus, the Court must address this issue of first impression. To do so, the Court will begin by providing an overview of the rules for interpreting Louisiana laws generally before applying those methods to the statutes at issue. When that analysis is performed, the answer becomes clear: there is no exhaustion requirement under the Louisiana PLRA for descendants like Plaintiffs.

### 1. Louisiana Law Generally

Because of Louisiana's civilian tradition, "Louisiana's 'Constitution, codes, and statutes'
are of paramount importance to its judges." *Jorge-Chavelas*, 917 F.3d at 851 (quoting *Am. Int'l
Specialty Lines Ins. Co. v. Canal Indem. Co.*, 352 F.3d 254, 260 (5th Cir. 2003)).

> Unlike stare decisis, which can flow from one decision, in the civil
> system numerous court decisions must agree on a legal issue to
> establish *jurisprudence constante* (French for constant
> jurisprudence). And even when that consensus exists in the caselaw,
> it remains only persuasive authority for the *Erie* guess; "we are not
> strictly bound" by the decisions of Louisiana's intermediate courts.

*Id.*

In *Pierce Foundations, Inc. v. Jaroy Construction, Inc.*, 2015-0785 (La. 5/3/16), 190 So.
3d 298, the Louisiana Supreme Court summarized its own case law and the relevant statutes
governing interpretation of Louisiana laws as follows:

> Legislation is the solemn expression of the legislative will; thus, the
> interpretation of legislation is primarily the search for the legislative
> intent.  When a law is clear and unambiguous, and its application
> does not lead to absurd consequences, it shall be applied as written,
> with no further interpretation made in search of the legislative
> intent. The starting point for interpretation of any statute is the
> language of the statute itself.  Additionally, all laws pertaining to the
> same subject matter must be interpreted in *pari materia,* or in
> reference to each other.  When, on the other hand, a statute is not
> clear and unambiguous, or its application leads to absurd
> consequences, we rely on secondary rules of statutory interpretation
> to discern the meaning of the statute at issue.  In such cases, the
> statute must be interpreted as having the meaning that best conforms
> to the purpose of the law. Moreover, when the words of a law are
> ambiguous, their meaning must be sought by examining the context
> in which they occur and the text of the law as a whole.

*Id.* at 303 (cleaned up).

### *2. The Louisiana PLRA Is Clear and Unambiguous*

Under the Louisiana PLRA, "No *prisoner suit* shall assert a claim under state law until such administrative remedies as are available are exhausted. If a prisoner suit is filed in contravention of this Paragraph, the court shall dismiss the suit without prejudice." La. Rev. Stat. § 15:1184(A)(2) (emphasis added). The Louisiana PLRA defines "[c]ivil action with respect to prison conditions" or "prisoner suit" as:

> [A]ny civil proceeding with respect to the conditions of confinement or the effects of actions by government officials on the lives of persons confined in prison, but does not include post conviction relief or habeas corpus proceedings challenging the fact or duration of confinement in prison.

*Id.* § 15:1181(2). Additionally, the Louisiana PLRA defines "prisoner" as:

> [A]ny person subject to incarceration, detention, or admission to any prison who is accused of, convicted of, sentenced for, or adjudicated delinquent for a violation of criminal law or the terms or conditions of parole, probation, pretrial release, or a diversionary program. Status as a "prisoner" is determined as of the time the cause of action arises. Subsequent events, including post trial judicial action or release from custody, shall not affect such status.

*Id.* § 15:1181(6).

The Court finds that this language is clear and unambiguous: the Louisiana PLRA applies to "prisoner suits" and "prisoners," not to those like Plaintiffs bringing a survival action or wrongful death action on a prisoner's behalf. There is nothing in La. Rev. Stat. § 15:1181(2) or § 15:1181(6) to suggest that anyone other than a prisoner can bring a prisoner suit. Thus, under the plain language of the statute, Plaintiffs have the better argument.

Further, the definition of "prisoner" does not warrant a different conclusion. The latter half of La. Rev. Stat. § 15:1181(6) provides that "[s]tatus as a 'prisoner' is determined as of the time the cause of action arises," and some could argue, as Livingston does, that this has to be construed

to encompass a survival action, which arises "simultaneously with the existence of the tort and is transmitted to beneficiaries upon the victim's death and permits recovery only for the damages suffered by the victim from the time of injury to the moment of death." *Taylor v. Giddens*, 618 So. 2d 834, 840 (La. 1993). The Louisiana PLRA further provides that "[s]ubsequent events, including post trial judicial action or release from custody, shall not affect such status[,]" so, the argument would go, the death of a prisoner does not affect his status, even in an action brought by a survivor or beneficiary. *See* La. Rev. Stat. § 15:1181(6).

But such an interpretation would contravene the other plain language of the Louisiana PLRA for three reasons. First, both of these sentences must be read in conjunction with the other parts of La. Rev. Stat. § 15:1181, which unambiguously refers to "prisoners" and "prisoner suits," not survivors and beneficiaries. With the text clear, no further interpretation can be made in search of the legislative intent. *See Pierce Founds.*, 190 So. 3d at 303.

Second, the phrase "[s]ubsequent events" must be read in the context of its illustrative examples, "post trial judicial action and release from custody." Both refer to changes in legal status or confinement, not to the natural death or health of a prisoner. Again, the meaning is plain.

And third, and perhaps most convincing, even if La. Rev. Stat. § 15:1181(6) could be read to include a survival action, such an interpretation would lead to absurd results. Unlike a survival claim, a wrongful death claim arises at the death of the decedent, as it "compensates the beneficiaries for their own injuries which they suffer from the moment of the victim's death and thereafter." *Taylor*, 618 So. 2d at 840. Thus, the terms "prisoner" and "prisoner suits" could in no way be read to include wrongful death actions. Any interpretation of the Louisiana PLRA that would apply one standard for survival actions and a different one for wrongful death actions would be overly formalistic and nonsensical.

Further, as Livingston contends in its original memorandum, the Parish is entitled by law to craft its own rules and administrative grievance policies, and LPDC's is Policy No. F-160. (Doc. 5-1 at 4–5.) This policy is found in LPDC's Policies and Procedures Manual, and the policy is also detailed in the Inmate Handbook that inmates receive upon arrival to LPDC. (*Id.* at 5.) Although the Parish's brief suggests that this policy is readily available to inmates, this policy is not readily available to the public. After diligent research, this Court could not find Policy No. F-160 in the public domain.  And since each parish can create its own rules, there is no central repository (public or otherwise) for the exhaustion rules for Louisiana's jails for survivors to search. Given the fact that this policy is not readily available to the public, if subject to the Louisiana PLRA's administrative-exhaustion requirement, Mr. Abshire's daughters would have no way of knowing that administrative-grievance procedures exist or how to comply with these procedures. Subjecting a decedent's survivors like Mr. Abshire's daughters to an administrative process about which they have neither knowledge of nor access to would lead to unfair and absurd results contrary to the plain language of the Louisiana PLRA.

In short, "prisoners" means prisoners, not survivors or beneficiaries, and the only reasonable interpretation of the plain language of the Louisiana PLRA is that the latter do not have to exhaust a decedent prisoner's administrative remedies. On this ground alone, the Parish's motion could be denied.

### 3. Even if Ambiguous, the Purpose of the Law and Other Similar Laws Support the Court's Conclusion

Even if the Louisiana PLRA was ambiguous, the "statute must be interpreted as having the meaning that best conforms to the purpose of the law," *Pierce Founds.*, 190 So. 3d at 303, and such an analysis leads to the unmistakable conclusion that Plaintiffs need not exhaust Mr. Abshire's administrative remedies.  In the legislative document enacting Louisiana PLRA, the

Louisiana Legislature made clear that the purpose of enacting the Louisiana PLRA was "to enact Part XVI of Chapter 7 of Title 15 of the Louisiana Revised Statutes of 1950, to be comprised of R.S. 15:1181 through 1190, *relative to suits by prisoners . . . .*" *See* Act No. 731, 1997 La. Acts. No where did the legislature make a carve out for "*suits by wrongful death and survival claimants*."

Further, Livingston concedes that the Louisiana PLRA was modeled on the Federal PLRA, (Doc. 5-1 at 2), and this fact further undercuts the Parish's position. The Federal PLRA has a similar definition to the Louisiana PLRA: "the term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." 42 U.S.C § 1997e(h). Likewise, the Federal PLRA has an administrative-exhaustion requirement similar to that of the Louisiana PLRA:

> The court shall on its own motion or on the motion of a party dismiss any action brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility if the court is satisfied that the action is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant who is immune from such relief.

*Id.* § 1997e(c)(1). Yet, federal courts have interpreted the Federal PLRA's administrative-exhaustion requirement to only apply to prisoners, not a decedent's survivors or beneficiaries. *See Greer v Tran*, No. 02-3145, 2003 WL 21467558, at *2 (E.D. La. June 23, 2003); *Netters v. Tenn. Dep't of Corr.*, No. 04-2396, 2005 WL 2113587, at *3 n.3 (W.D. Tenn. Aug. 30, 2005); *Simmons ex rel. Estate of Simmons v. Johnson*, No. 7:05-00053, 2005 WL 2671537, at *2 (Oct. 20, 2005); *Bogus v. Ala. Dep't of Corr.*, No. 7:06-1667, 2008 WL 11379957, at *29–30 (N.D. Ala. Sept. 22, 2008); *Tretter v. Pa. Dep't of Corr.*, 558 F. App'x 155, 157–58 (3d Cir. 2014) (reversing dismissal of suit filed by mother and administratrix of prisoner's estate and finding that she did not have to

exhaust remedies under the Federal PLRA); *see also Dunn v. Dunn*, 219 F. Supp. 3d 1163, 1176 (M.D. Ala. 2016) ("This accords with the sensible conclusions reached by a number of other courts that the estates and guardians of prisoners are not 'prisoners' and are therefore not subject to the PLRA's exhaustion requirement." (collecting cases, including *Tretter*)).  Thus, when looking to the Federal PLRA by analogy, this Court's conclusion holds true.

Additionally, the intent behind the Federal PLRA also supports the Court's conclusion that Louisiana's PLRA does not apply to survivor and wrongful death actions.  As the Fifth Circuit has recognized, one of the purposes of that federal law is "the goal of giving officials 'time and opportunity to address complaints internally,' " *Johnson v. Johnson*, 385 F.3d 503, 516 (5th Cir. 2004) (quoting *Porter v. Nussle*, 534 U.S. 516, 525 (2002)); *see also Johnson v. Guillot*, No. 22-584, 2022 WL 19039742, at *2 (M.D. La. Dec. 16, 2022) (describing this as one of the "principal purposes" of the Federal PLRA (citing *Johnson* and *Porter*)), *report and recommendation adopted*, No. 22-584, 2023 WL 2531478 (M.D. La. Mar. 15, 2023.  However, this purpose is not served in survival and wrongful death actions, where all of the damages have been sustained, and there is no corrective action that could possibly take place. For this additional reason, the Federal PLRA supports this Court's decision.

Even putting this aside, "all laws pertaining to the same subject matter must be interpreted in *pari materia,* or in reference to each other," *Pierce Founds.*, 190 So. 3d 298 at 303, and comparing the Louisiana PLRA to other Louisiana laws involving exhaustion strengthens this Court's conclusion. For example, unlike the Louisiana PLRA, the Louisiana Legislature explicitly provided for a decedent's descendants needing to exhaust administrative remedies in the Louisiana Medical Malpractice Act ("LMMA"). In drafting the LMMA, the Louisiana Legislature specifically provided that a request for a medical review panel must include "[t]he name of only

one patient for whom, *or on whose behalf*, the request for review is being filed . . . ." La. Rev. Stat. § 1231.8(A)(b)(ii) (emphasis added). As evidenced by Louisiana jurisprudence, La. Rev. Stat. § 1231.8(A)(b)(ii) requires a decedent's descendant to first go through a medical review panel before bringing forth a decedent's medical malpractice claim in court. *See, e.g.*, *Medical Review Complaint by Downing*, 2018-1027 (La. App. 4d Cir. 5/8/19), 272 So. 3d 55 (in which a decedent's estate first filed its medical malpractice wrongful death and survival claims with the medical review panel). That the Louisiana Legislature could have included in the PLRA a specific requirement that a prisoner's survivors exhaust remedies before filing suit (as it did with LMMA) but did not, supports this Court's conclusion.

### 4. Livingston's Interpretation is Faulty

Indeed, the Parish's entire argument rests on two Louisiana appellate decisions—*Williams v. LaSalle Corr. Ctr. L.L.C.*, 51,260 (La. App. 2 Cir. 4/5/17), 217 So. 3d 1219, and *Kent v. State Through Dep't of Pub. Safety & Corr.*, 2014-1010 (La. App 1 Cir. 9/23/14), 2014 WL 12569755, *writ denied*, 2014-2221 (La. 1/9/15), 157 So. 3d 1107. These cases have found that "survival and wrongful death claims constitute 'civil actions with respect to prison conditions,' under La. R.S. 15:1181(2) of the Prison Litigation Reform Act . . . ." *Kent*, 2014 WL 12569755, at *1; *see also Williams*, 217 So. 3d 1219, 1226. Under the logic of *Williams* and *Kent*, since "civil action with respect to prison conditions" has the same definition as "prisoner suit," and since "[n]o prisoner suit shall assert a claim under state law until such administrative remedies as are available are exhausted[,]" La. Rev. Stat. § 15:1184(A)(2), then, Livingston argues, survivors and wrongful death beneficiaries bringing "prisoner suits" must exhaust administrative remedies.

But, there are several problems with Livingston's position and with these cases. First, the issue before the *Williams* and *Kent* courts was whether a wrongful death and survival action is

subject to the Louisiana PLRA's venue requirements. *See Williams*, 217 So. 3d 1219; *Kent*, 2014

WL 12569755.  Louisiana Revised Statutes § 15:1184(F) provides:

> The exclusive venue for delictual actions for injury or damages shall be *the parish where the prison is situated to which the prisoner was assigned when the cause of action arose*. Upon consent of all parties, the court may transfer the suit to a parish in which venue would otherwise be proper.

La. Rev. Stat. § 15:1184(F) (emphasis added).   Since the issue before this Court deals with

exhausting administrative remedies under the Louisiana PLRA rather than the statute's venue

requirements, *Williams* and *Kent* are distinguishable.  Because both of these cases dealt with the

venue issue only, neither decision was required to confront the issue of requiring the survivors of

a prisoner who dies in prison to comply with exhaustion requirements about which they are

unaware and which are not publicly available to them.

More fundamentally, as the Fifth Circuit has recognized, "[t]hree [court of appeal]

decisions do not *jurisprudence constante* make." *Jorge-Chavelas*, 917 F.3d at 853.   Even if

*Williams* and *Kent* directly support Livingston's position, that alone is not enough under

Louisiana's civilian tradition to trump either the clear and unambiguous language of the statute or

Louisiana law's other methods of statutory interpretation used above.

### 5. Summary of Louisiana PLRA Ruling

In sum, the plain language of the Louisiana PLRA provides that it applies to only "prisoner

suits"—i.e., suits involving prisoners.  Moreover, this interpretation best conforms both to the

legislative intent and to other similar laws involving exhaustion.  Livingston's interpretation to the

contrary is misguided; not only does it conflict with the plain language of the statute, but it also

leads to absurd results. Consequently, this Courts holds that Plaintiffs are not subject to the

Louisiana PLRA's administrative-exhaustion requirement.  Livingston's *Motion to Dismiss* on this issue is thus denied.

IV.    **MOTION TO DISMISS: FAILURE TO STATE A CLAIM**

    **A. Rule 12(b)(6) Standard**

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.' " *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting Fed. R. Civ. P. 8(a)(2)).  "Specific facts are not necessary; the statement need only ' "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." ' " *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "Federal pleading rules . . . do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11 (2014) (citation omitted).

Interpreting Rule 8(a) of the Federal Rules of Civil Procedure, the Fifth Circuit has explained:

> The complaint (1) on its face (2) must contain enough factual matter (taken as true) (3) to raise a reasonable hope or expectation (4) that discovery will reveal relevant evidence of each element of a claim. "Asking for [such] plausible grounds to infer [the element of a claim] *does not impose a probability requirement* at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal [that the elements of the claim existed]."

*Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 257 (5th Cir. 2009) (alterations in original) (footnotes omitted) (quoting  *Twombly*, 550 U.S. at 556).

Later, in *In re Great Lakes Dredge & Dock Co. LLC.*, 624 F.3d 201 (5th Cir. 2010), the Fifth Circuit explained:

> To avoid dismissal [under Fed. R. Civ. P. 12(b)(6)], "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556

U.S. 662 [ ] (2009) (quoting [*Twombly*, 550 U.S. at 570]). To be plausible, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 . . . . In deciding whether the complaint states a valid claim for relief, we accept all well-pleaded facts as true and construe the complaint in the light most favorable to the plaintiff. [*Doe v. Myspace,* 528 F.3d 413, 418 (5th Cir. 2008)] (citing [*Hughes v. Tobacco Inst., Inc*., 278 F.3d 417, 420 (5th Cir. 2001)]). We do not accept as true "conclusory allegations, unwarranted factual inferences, or legal conclusions." *Ferrer v. Chevron Corp*., 484 F.3d 776, 780 (5th Cir. 2007) (quoting *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005)); *see also Iqbal*, [556 U.S. at 664] ("While legal conclusions can provide the complaint's framework, they must be supported by factual allegations.").

*Id.* at 210.

Applying the above case law, our brother in the Western District of Louisiana has stated:

Therefore, while the court is not to give the "assumption of truth" to conclusions, factual allegations remain so entitled. Once those factual allegations are identified, drawing on the court's judicial experience and common sense, the analysis is whether those facts, which need not be detailed or specific, allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." [*Iqbal*, 556 U.S. at 678]; *Twombly*, 55[0] U.S. at 556 [.] This analysis is not substantively different from that set forth in *Lormand, supra,* nor does this jurisprudence foreclose the option that discovery must be undertaken in order to raise relevant information to support an element of the claim. The standard, under the specific language of Fed. R. Civ. P. 8(a)(2), remains that the defendant be given adequate notice of the claim and the grounds upon which it is based. This standard is met by the "reasonable inference" the court must make that, with or without discovery, the facts set forth a plausible claim for relief under a particular theory of law provided that there is a "reasonable expectation" that "discovery will reveal relevant evidence of each element of the claim." *Lormand*, 565 F.3d at 257; *Twombly*, 55[0] U.S. at 556 [.]

*Diamond Servs. Corp. v. Oceanografia, S.A. De C.V.*, No. 10-00177, 2011 WL 938785, at *3

(W.D. La. Feb. 9, 2011) (citation omitted).

Afterward, in *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787 (5th Cir. 2011),

the Fifth Circuit explained:

> "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" A claim for relief is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." A claim for relief is implausible on its face when "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct."

*Id.* at 796 (internal citations omitted).

Finally, in *Thompson v. City of Waco, Texas*, 764 F.3d 500 (5th Cir. 2014), the Fifth Circuit recently summarized the Rule 12(b)(6) standard as thus:

> We accept all well-pleaded facts as true and view all facts in the light most favorable to the plaintiff. We need not, however, accept the plaintiff's legal conclusions as true. To survive dismissal, a plaintiff must plead enough facts to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Our task, then, is to determine whether the plaintiff stated a legally cognizable claim that is plausible, not to evaluate the plaintiff's likelihood of success.

*Id.* at 502–03 (internal citations and quotations omitted).

Additionally, "[i]n determining whether a plaintiff's claims survive a Rule 12(b)(6) motion to dismiss, the factual information to which the court addresses its inquiry is limited to (1) the facts set forth in the complaint, (2) documents attached to the complaint, and (3) matters of which judicial notice may be taken under Federal Rule of Evidence 201." *Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 900 (5th Cir. 2019) (citations omitted). However, "[a]lthough a 'court may also consider documents attached to either a motion to dismiss or an opposition to that motion when the documents are referred to in the pleadings and are central to a plaintiff's claims,' . . . the court need not do so." *Brackens v. Stericycle, Inc.*, 829 F. App'x 17, 23 (5th Cir. 2020) (per curiam) (quoting *Brand Coupon Network, L.L.C. v. Catalina Mktg. Corp.*, 748 F.3d

631, 635 (5th Cir. 2014)).  *See also id.* (finding no abuse of discretion "in excluding . . . exhibits, even though some were referenced in [plaintiff's] pleading") (citing *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008) ("using permissive language regarding a court's ability to rely on documents incorporated into the complaint by reference")).

### B.  Parties' Arguments

In the event that this Court does find that it has subject matter jurisdiction over Plaintiffs' claims, Livingston argues that Plaintiffs are not entitled to attorney's fees and damages under the LHRA. (Doc. 5-1 at 8.) The Parish contends that under this statute, "only the rights of access to goods and services are protected, not the content of the goods and services." (*Id.* at 9.) Rather than alleging that Mr. Abshire did not receive medical services at LPDC, Plaintiffs instead disagree with the type of medical treatment that Mr. Abshire received. (*Id.*) Therefore, Plaintiffs have not stated a claim for which relief can be granted under the LHRA. (*Id.*) Likewise, Plaintiffs failed to establish that Mr. Abshire was "disabled," as is required to receive damages under this statute. (*Id.* at 9–10.) To qualify as "disabled," Mr. Abshire would have had to "experience[] substantial limitations to several major life activities." (*Id.* at 10 (citation omitted).) Livingston argues that Plaintiffs have not alleged facts in their *Complaint* to support such an assertion; thus, dismissal under Federal Rule of Civil Procedure 12(b)(6) is proper. (*Id.*)

Plaintiffs respond that they alleged a disability to sustain their claim under the LHRA because Mr. Abshire's cancer qualifies as a per se disability. (Doc. 10 at 8.) Louisiana Revised Statute § 51:2232(3)(a) and the ADA, 42 U.S.C. § 12102(1), as Plaintiffs assert, share almost verbatim definitions for the term "disability." (*Id.*) Since cancer qualifies as a per se disability under the ADA and the LHRA similarly defines disabilities, Plaintiffs have alleged a sufficient disability under the LHRA through alleging that Mr. Abshire had cancer. (*Id.* at 8–9.)

Plaintiffs also argue that they alleged adequate facts to support their claim that Mr. Abshire experienced discrimination, as there is case law to suggest that LPDC's failure to provide Mr. Abshire a necessary medical device related to his disability constitutes discrimination. (*Id.* at 9–12.) Thus, Plaintiffs have alleged sufficient facts to withstand their claim under the LHRA, that Mr. Abshire was discriminated against due to his disability in violation of the ADA, and by extension the LHRA. (*Id.* at 9.)

In reply, Defendants argue that under the LHRA "only the rights of access to goods and services are protected, not the content of the goods and services." (Doc. 16 at 3.) Further, the LHRA is less expansive than the ADA. (*Id.*) While an allegation of dissatisfaction of medical services may be enough to sustain an ADA claim, it is not enough to support a claim under the less-expansive LHRA. (*Id.*) Therefore, Plaintiffs have failed to state a valid claim under the LHRA to be entitled to attorney's fees under the Act. (*Id.* at 3–4.)

## C. Law and Analysis

### 1. The LHRA Generally

Under the LHRA:

> Any person deeming himself injured by any alleged violation of the provisions of [this Act] shall have a civil cause of action in district court to enjoin further violations and to recover the actual damages sustained by him, together with the costs of court and a reasonable fee for his attorney of record, all of which shall be in addition to any other remedies contained in this [Act].

La. Rev. Stat. § 51:2264. The Act further provides:

> [I]t is a discriminatory practice for a person to deny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of a place of public accommodation, resort, or amusement, as defined in this Chapter, on the grounds of race, creed, color, religion, sex, age, *disability, as defined in R.S. 51:2232*, or national origin.

26

*Id.* § 51:2247 (emphasis added).  Louisiana courts can look to the ADA for guidance when interpreting the LHRA. *See, e.g.*, *Cougle v. Berkshire Life Ins. Co. of Am.*, 429 F. Supp. 3d 208, 217–18 (E.D. La. 2019).

### *2. Mr. Abshire's Cancer is a "Disability" Under the LHRA*

For their LHRA claim to survive a motion to dismiss, Plaintiffs need to have alleged a disability, as defined by that law, in their *Complaint*.  Louisiana Revised Statutes § 51:2232 defines "disability" as follows:

> "Disability" means a physical or mental impairment that substantially limits one or more of the major life activities of the individual, a record of such impairment, or being regarded as having such an impairment. For purposes of all laws which incorporate by reference, apply to, or rely for meaning upon the term disability as defined herein, the terms used in this definition have the following meanings:
>
> > (i) "Major life activities" includes functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.
> >
> > (ii) "Mental impairment" means any mental or psychological disorder, such as intellectual disability, organic brain syndrome, emotional or mental illness, and specific learning disabilities.
> >
> > (iii) "Physical impairment" means any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory, including speech organs, cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine.

La. Rev. Stat. § 51: 2232(3).

Louisiana Revised Statutes § 51:2232's definition of "disability" is almost verbatim the ADA's definition of "disability." *See* 42 U.S.C. § 12102. Cancer is a per se disability under the ADA. 28 C.F.R. § 35.108 ("Disability means, with respect to an individual: [a] physical or mental impairment that substantially limits one or more of the major life activities . . . . Physical or mental impairment means . . . cancer . . . . The [following] types of impairments described in this paragraph may substantially limit additional major life activities[:] . . . Cancer . . . .").

Here, Plaintiffs clearly allege that Mr. Abshire had cancer, (Doc. 1 at ¶¶ 22–24). Given the facts that (1) there is a lack of Louisiana jurisprudence on whether cancer is a disability under the LHRA; (2) that the LHRA and the ADA share an almost verbatim definition of "disability;" and (3) that cancer is a per se disability under the ADA, the Court finds that Plaintiffs have adequately pled a disability for purposes of the LHRA.  Accordingly, Livingston's *Motion to Dismiss* will be denied on this issue.

### 3. Mr. Abshire's Requested Accommodation Was Reasonable

#### a.  Applicable Law

While Plaintiffs have alleged a disability under the LHRA, for their claims under La. Rev. Stat. § 51:2264 for damages, attorney's fees, and court costs to survive a motion to dismiss, Plaintiffs must sufficiently allege that LPDC denied Mr. Abshire "*the full and equal enjoyment* of the goods, services, facilities, privileges, advantages, and accommodations" of its services. La. Rev. Stat. § 51:2247 (emphasis added). "Because no Louisiana court has applied the LHRA in this context, the Court again turns to the ADA and its caselaw as a reference." *Cougle*, 429 F. Supp. 3d at 217.

As explained above, "Title II of the ADA provides: '[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the

benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.' " *Cadena v. El Paso Cnty.*, 946 F.3d 717, 723 (5th Cir. 2020) (alteration in original) (quoting 42 U.S.C. § 12132). Under the ADA, "prisons are public entities that may not exclude disabled individuals from participation in or deny them the benefits of their services, programs, or activities." *Id.* (citing *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998)).

In *Cadena*, the Fifth Circuit laid out the appropriate standard to apply for ADA claims of this nature:

> To make out a *prima facie* case under Title II or the Rehabilitation Act, a plaintiff must show "(1) that he is a qualified individual within the meaning of the ADA; (2) that he is being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination is by reason of his disability." *Melton v.* [*Dall.*] *Area Rapid Transit*, 391 F.3d 669, 671–72 (5th Cir. 2004). "In addition to their respective prohibitions of disability-based discrimination, both the ADA and the Rehabilitation Act impose upon public entities an affirmative obligation to make reasonable accommodations for disabled individuals." *Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454 (5th Cir. 2005)[.] . . . For this type of claim, a plaintiff must show that the entity knew of the disability and its consequential limitations, either because the plaintiff requested an accommodation or because the nature of the limitation was open and obvious. *Windham* [*v. Harris Cty.*, 875 F.3d 229, 236–37 (5th Cir. 2017)] (citing *Taylor v. Principal Fin. Grp., Inc.*, 93 F.3d 155, 164 (5th Cir. 1996)). A plaintiff's requested accommodation must also be "reasonable," meaning that it does not impose undue financial or administrative burdens or "fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7); *see also Frame v. City of Arlington*, 657 F.3d 215, 232 (5th Cir. 2011) (en banc).

*Cadena*, 946 F.3d at 723–24.

Lastly, if a plaintiff seeks compensatory damages, he must demonstrate that the "discrimination was intentional." *Id.* at 724 (citing *Delano-Pyle v. Victoria Cnty.*, 302 F.3d 567, 574 (5th Cir. 2002)). While not precisely defined, "the cases to have touched on the issue require 'something more than "deliberate indifference," ' despite most other circuits defining the requirement as equivalent to deliberate indifference." *Id.* (quoting *Miraglia v. Bd. of Supervisors of La. State Museum*, 901 F.3d 565, 575 (5th Cir. 2018) (quoting *Delano-Pyle*, 302 F.3d at 575)). The Fifth Circuit has illustrated this point with the following examples:

> In practice, this court has affirmed a finding of intentional discrimination when a county deputy knew that a hearing-impaired suspect could not understand him, rendering his chosen method of communication ineffective, and the deputy made no attempt to adapt. *Delano-Pyle*, 302 F.3d at 575–76. The court has also found that a plaintiff created a genuine dispute as to intentional discrimination when the evidence indicated that "on several occasions, an interpreter was requested but not provided," and one of the forms of communication that a hospital used to speak with a hearing-impaired patient was often ineffective. *Perez v. [Drs.] Hosp. at Renaissance, Ltd.*, 624 F. App'x 180, 185 (5th Cir. 2015).

*Id.* at 724.

Several Fifth Circuit cases have held that a reasonable juror could find an ADA violation when the evidence, viewed in a light most favorable to the plaintiff, suggested that a prison failed to provide inmates with medical equipment or devices, thus denying the inmate a reasonable accommodation.  *See id.* at 725 (denying a motion for summary judgment under the ADA when there were genuine issues of material fact as to defendant-prison's failure to provide a prisoner various forms of medical care, modified food delivery, and a wheelchair); *Mealy v. Gautreaux*, No. 16-716, 2020 WL 515853, at *10–11 (M.D. La. Jan. 31, 2020) (deGravelles, J.) (denying a motion for summary judgment under the ADA when there were genuine issues of material fact as to defendant-prison's failure to provide a prisoner a wheelchair; accessible shower chair; and

access to a regular supply of adult diapers, catheters, and suppositories.).   These cases are consistent with ADA regulatory guidance:

> The Department wishes to emphasize that detention and correctional facilities are unique facilities under title II. Inmates cannot leave the facilities and must have their needs met by the corrections system, including needs relating to a disability. If the detention and correctional facilities fail to accommodate prisoners with disabilities, these individuals have little recourse, particularly when the need is great (e.g., an accessible toilet; adequate catheters; or a shower chair). It is essential that corrections systems fulfill their nondiscrimination and program access obligations by adequately addressing the needs of prisoners with disabilities, which include, but are not limited to, proper medication and medical treatment, accessible toilet and shower facilities, devices such as a bed transfer or a shower chair, and assistance with hygiene methods for prisoners with physical disabilities.

28 C.F.R. Pt. 35, App. A, Title II Regulations 2010 Guidance and Section-by-Section Analysis, Effective March 15, 2011.

### b. Analysis

Considering this analogous standard, the Court finds that Plaintiffs stated a viable claim under the LHRA.  As Plaintiffs have alleged in their *Complaint*, Mr. Abshire requested his Optune Device, his daughters provided LPDC the device, but LPDC never gave Mr. Abshire the device. (Doc. 1 at ¶¶ 40–41, 104.)   Livingston cannot seriously dispute that it did not know of Mr. Abshire's disability or the limitations imposed by it, (*see id.* at ¶¶ 33–37), and its failure to provide the device despite full knowledge of the harm that it could and did impose on Mr. Abshire amounts to more than deliberate indifference under the above authorities. Thus, LPDC denied Mr. Abshire "the full and equal enjoyment" of its medical services by denying him his Optune Device, an accommodation which, again, his daughters provided to LPDC.

Nor can Livingston seriously argue that Mr. Abshire's requested accommodation "impose[d] undue financial or administrative burdens or fundamentally alter[ed] the nature of the

service, program, or activity." *Cadena*, 946 F.3d at 723–24 (cleaned up).  Preliminarily, this is an affirmative defense, *see Greer v. Richardson Indep. Sch. Dist.*, 472 F. App'x 287, 292 (5th Cir. 2012), so this defense must "appear[ ] on the face of the pleadings" for "dismissal under Rule 12(b)(6) [to] be appropriate," *Miller v. BAC Home Loans Servicing, L.P.*, 726 F.3d 717, 726 (5th Cir. 2013) (citations omitted); *see also* 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2022) ("As the case law makes clear, the complaint also is subject to dismissal under Rule 12(b)(6) when its allegations indicate the existence of an affirmative defense that will bar the award of any remedy; but for this to occur, the applicability of the defense has to be clearly indicated and must appear on the face of the pleading to be used as the basis for the motion.").

Here, the only thing remotely touching on this defense on the face of the pleading is the Parish's ignorance of how to operate the device (despite having an instruction manual) and the presence of a pregnant employee at the facility. (Doc. 1 at ¶¶ 45–46.) The Parish makes no effort to explain how this might constitute an undue burden or to argue this issue at all.  Thus, any such defense is waived for the present motion. *See, e.g.*, *Payton v. Town of Maringouin*, No. 18-563, 2021 WL 2544416, at *26 (M.D. La. June 21, 2021) (deGravelles, J.) (collecting authorities on waiver).

Finally, Livingston Parish's assertion that the LHRA only applies to access rather than content of goods and services is without merit. The Parish bases its entire argument on a single Eastern District of Louisiana decision, *Cougle*, but this position is misplaced for several reasons.

First, *Cougle* is distinguishable. *Cougle* involved the LHRA and life insurance benefits, not reasonable modifications in prisons. *Cougle*, 429 F. Supp. 3d 208.

Second, Livingston argues, based on *Cougle*, that the LHRA is narrower than the ADA, but, for purposes of this issue, the Court disagrees.  In *Cougle*, Plaintiff argued that the LHRA was "necessarily broader than the ADA, and therefore the ADA [was] of limited value in this context." *Id.* at 218.  The Court rejected that argument, saying "The LHRA provides that disabled individuals are entitled to 'equal enjoyment' of goods and services in places of public accommodation. This language is perhaps even less expansive than that of the 'full and equal enjoyment' language of the ADA . . . ." *Id.* at 218–19 (citing 42 U.S.C. § 12182(a)).  But *Cougle*'s assessment that the statute was "perhaps even less expansive" is hardly definitive guidance on the issue, particularly in light of the following.

Third, *Cougle* in fact strengthens *Plaintiffs'* position; just as *Cougle* looked to Fifth Circuit law interpreting the ADA with respect to insurance policies, so too should, here, the Court look to the ADA in the context of prisons and reasonable modifications. *See id.* at 217 ("Because no Louisiana court has applied the LHRA in this context, the Court again turns to the ADA and its caselaw as a reference.").

Is sum, *Cougle* is distinguishable and equivocal on the main issue Livingston relies upon and ultimately favorable to Plaintiff.  For all these reasons, and the reasons detailed above, the Court finds that Plaintiffs have adequately pled that Livingston denied Mr. Abshire "the full and equal enjoyment" of its medical services by denying him his Optune Device.

### 4. Summary of LHRA Ruling

In sum, Plaintiffs have stated cognizable claims under the LHRA.  First, since cancer is a per se disability under the ADA and, by extension, the LHRA, Plaintiffs sufficiently alleged a disability under the LHRA by alleging Mr. Abshire had cancer. Second, Plaintiffs have adequately pled that LPDC discriminated against Mr. Abshire by not allowing him to have access to his

Optune Device that his daughters provided to LPDC, which was a reasonable accommodation for his condition.  Further, Livingston knew of Mr. Abshire's condition and his resulting limitations, knew of the necessity of the device, and yet, according to the well pleaded allegations, acted with "something more than deliberate indifference" to that need, according to the above authorities. Therefore, the *Motion to Dismiss* the LHRA claim will be denied.

V.    CONCLUSION

Accordingly,

**IT IS ORDERED** that the *Motion to Dismiss*, (Doc. 5), filed by Defendant Livingston Parish is **DENIED.**

Signed in Baton Rouge, Louisiana, on <u>March 30, 2023</u>.

_____

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**