# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

TAYLOR ABSHIRE, INDIVIDUALLY
AND ON BEHALF OF THE UNOPENED
SUCCESSION OF RICHARD ABSHIRE,
ET AL.

**CIVIL ACTION**

**VERSUS**

**NO. 22-548-JWD-SDJ**

LIVINGSTON PARISH, ET AL.

## RULING AND ORDER

This matter comes before the Court on the *Rule 12(b)(6) Motion to Dismiss and to Stay by Defendant, Dr. James Taylor* ("Dr. Taylor") (Doc. 14). Plaintiffs Taylor Abshire, Kaysi Abshire, and Lindsey Johnson, all individually and on behalf of the unopened succession of Richard Abshire, and Lindsey Johnson as next of friend of E.A. and A.A., (collectively, "Plaintiffs"), oppose the motion. (Doc. 19.) No reply was filed. Oral argument is not necessary. The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and is prepared to rule. For the following reasons, Dr. Taylor's motion is denied.

### I.    RELEVANT FACTUAL BACKGROUND

#### A.  Introduction

On August 11, 2022, Plaintiffs, daughters of Robert Abshire, filed suit against Livingston Parish ("Livingston" or the "Parish"), Sheriff Jason Ard, and Dr. Taylor (collectively, "Defendants") following Mr. Abshire's tragic death while in Livingston Parish Detention Center ("LPDC"). In sum, Plaintiffs allege that Mr. Abshire was denied a life-saving medical device—an Optune—which his family tried to provide to Defendants, and which would have reduced the risk of his dying of cancer. Plaintiffs assert the following causes of action: (1) Negligence, Wrongful

Death, and Survival (as to Livingston and Sheriff Ard); (2) violations of the Louisiana Human

Rights Act, La. Rev. Stat. § 51:2231 et seq. ("LHRA") (as to Livingston); and (3) deliberate

indifference and denial of medical care in violation of the Fourteenth Amendment under 42 U.S.C.

§ 1983 (as to Dr. Taylor). (*See Compl.*, Doc. 1.)

The Parish and Dr. Taylor moved for dismissal, (Docs. 5, 14), and the Sheriff moved for

summary judgment, (Doc. 23). On March 30, 2023, the Court issued a *Ruling and Order*

addressing the Parish's motion. *Abshire v. Livingston Par.*, No. 22-548, 2023 WL 2731040 (M.D.

La. Mar. 30, 2023), Doc. 31 (deGravelles, J.).  On May 22, 2023, the Court issued a *Ruling and*

*Order* dealing with the Sheriff's motion. (Doc. 36.)  The Court now takes up Dr. Taylor's motion.

### B.  Mr. Abshire's Medical Condition and Needed Device

In October 2019, Mr. Abshire was diagnosed with a glioblastoma multiforme tumor, a

cancer that invades nearby brain tissue but generally does not spread to distant organs. (*Compl.,*

Doc. 1 at ¶¶ 22–24.) By 2021, Mr. Abshire, a domiciliary of Livingston Parish, had received

treatment, and his cancer was in remission. (*Id.* at ¶¶ 21, 24.)

Mr. Abshire's oncologist prescribed Mr. Abshire an Optune, an FDA-approved medical

device which, prior to incarceration, Mr. Abshire was using. (*Id.* at ¶ 25.) An Optune Device

"delivers a dose of radiation to the head and is used in combination with the medication

Temozolomide" and is "260% more effective than monotherapy." (*Id.* at ¶¶ 26, 28.) As Plaintiffs

allege in their *Complaint*,

> The significant benefit conferred by the Optune Device is
> established via a statistically valid clinical study. Individuals with
> cancer that used TMZ medication alone only had a 5% chance of 5-
> year survival. In contrast, individuals who were a part of the Optune
> Device arm of the study had a documented 13% chance of 5-year
> survival.

(*Id.* at ¶ 27.)

### C. Mr. Abshire's Arrival at LPDC and Defendants' Knowledge of His Medical Condition

Mr. Abshire arrived at LPDC on or about July 21, 2021, as a pretrial detainee. (*Id.* at ¶ 32.) Under La. Rev. Stat. § 15:703(A), LPDC must have a physician who "shall attend [to] the prisoners who are confined in parish jails whenever they are sick." (*Id.* at ¶ 31.) Livingston contracted with Dr. James Taylor to be LPDC's physician who would provide medical care to the inmates "whenever they are sick." (*Id.* at ¶¶ 29–30.)

Upon his arrival to LPDC, Mr. Abshire relayed to medical staff that he needed an Optune Device because of his cancer diagnosis. (*Id.* at ¶ 33.) In a form he filled out on July 20, 2021, Mr. Abshire, in fear for his life, explained the following:

> I would like to find out if I'm eligible for compassionate Medical release. I understand it has to go through the warden[,] but I have a terminal illness, lucky to still be alive[,] and do not think I should pay for my actions with my life as I am undergoing periodic MRIs and CT scans. Thank you.

(*Id.* at ¶ 34.) Dr. Taylor spoke with Mr. Abshire's oncologist from Tulane that same day and thereafter recorded the following note in Mr. Abshire's medical records:

> Dr. Taylor spoke with Dr. Trevino (neuro-oncologist) today regarding inmate's medical condition. He reported that inmate needs his Optune Device on at least 15 hours a day. This device delivers radiation to the brain tumor. Inmate's head needs to be shaved every 2-3 days in order for the adhesive waivers to stick to his head.
>
> Inmate reported during the noon pill call that his daughter, Taylor[,] could bring his Optune Device up here for him to begin using. Called inmate's daughter who reported that she would bring it up here sometime today or tomorrow. When the device is received[,] he will need to be rehoused in a holding cell in booking. Inmate will also need to shave his head as it hasn't been shaved in several weeks.

(*Id.* at ¶ 35.) Since this medical note was recorded in Mr. Abshire's prison medical records, the note was available to all prison medical personnel who interacted with Mr. Abshire. (*Id.* at ¶ 36.)

3

Thus, Plaintiffs allege that "by July 20, 2021, defendant [Dr. Taylor] and the medical department knew that Mr. Abshire had cancer, needed the Optune Device, knew the duration that the device should be used each day, and knew the method of administration." (*Id.* at ¶ 37.) Despite this knowledge, Defendants did not provide Mr. Abshire with an Optune Device. (*Id.* at ¶ 38.)

On July 26, 2021, six days after Dr. Taylor communicated with Mr. Abshire's oncologist from Tulane, Ms. Courtney Chaney gave a "staff response" to Mr. Abshire, in which she acknowledged the potential need to transfer him to a facility better equipped to treat his condition:

> There is no such thing as a compassionate medical release. But as we receive more of your medical records, we will possibly be able to see about getting you transferred to another facility that is better able to treat you from a medical standpoint. But that is down the line.

(*Id.* at ¶ 39.) Mr. Abshire's daughter brought his Optune Device to LPDC on July 30, 2021; however, LPDC did not give Mr. Abshire the device. (*Id.* at ¶¶ 40–41.) Mr. Abshire then expressed the following in an August 17, 2021, medical form:

> I was told over 2 weeks ago that my Dr. wanted me to have my Optune device while incarcerated. I have not heard another word about this and am worried about my brain tumor returning. I have had in creasing [sic] worse headaches and feel I am being ignored and that your medical staff does not care about my health. My family has gone through a lot to get a new device ordered, and I need to have it. I hope your team knows how serious a glioblastoma multiforme tumor is. Thank you, Richard Abshire.

(*Id.* at ¶ 42.) Despite this request, Defendants did not give Mr. Abshire his Optune Device, nor was there evidence that they assessed his vitals. (*Id.* at ¶¶ 43–44.)

Mr. Abshire's family called LPDC daily requesting that the Optune Device be made available to Mr. Abshire, but they were told that the device was not made available to Mr. Abshire because (1) LPDC "didn't know how to use it," despite having an instruction manual; and (2) a pregnant nurse at the facility could not be around the device. (*Id.* at ¶¶ 45–46.)

4

### D. Mr. Abshire's Deteriorating Condition

On August 24, 2021, other inmates alerted medical staff that "Mr. Abshire was dizzy and going to pass out." (*Id.* at ¶ 47.) Despite this alert, medical staff did not give Mr. Abshire the Optune Device nor assess his vitals. (*Id.* at ¶¶ 48–49.)

The following day on August 25, 2021, Mr. Abshire requested medical assistance. (*Id.* at ¶ 50.) When Ms. Joyce Kohler, LPN, arrived at his cell, Mr. Abshire alerted her that "something [was] seriously wrong," namely that (1) "he needed to see his doctor or go to the emergency room"; (2) "he hadn't slept in two days"; and (3) "he had painful headaches." (*Id.*) Ms. Kohler and Mr. Abshire then had a verbal altercation regarding whether Mr. Abshire had been sleeping, and Ms. Kohler "offered a lackluster apology" for his headache. (*Id.* at ¶¶ 50.) During this altercation, Mr. Abshire expressed concern that he was going to die while at LPDC. (*Id.* at ¶ 51.) There is no indication that Ms. Kohler assessed Mr. Abshire's vitals while at his cell or that she reported Mr. Abshire's concerns about dying to Dr. Taylor. (*Id.* at ¶¶ 52–53.)

Later that day, Mr. Abshire pressed the emergency call button complaining of severe headaches and confusion. (*Id.* at ¶ 54.) However, skeptical of Mr. Abshire's report of confusion, medical staff noted that "inmate was not noted to be disoriented at either pill call today," and Mr. Abshire's vitals were not assessed. (*Id.* at ¶¶ 54–55.)

Following this incident, on August 28, 2021, Mr. Abshire further inquired into why he did not have access to his Optune Device, and LPDC expressed in a note that "[due to] the pandemic, we are unable to bring anyone in the facility to set it up for him." (*Id.* at ¶ 56 (alteration in original).)

By September 7, 2021, medical staff began documenting the deterioration of Mr. Abshire's condition. (*Id.* at ¶ 57.) Specifically, Ms. Lacey Shelton noted: "Inmate's movement has been noticeable [sic] slow during pill call. He sits on the bed and shares [sic] for about a minute or two

before attempting to get up. He appears to be confused and has an unsteady gait, using the bed and wall to ambulate." (*Id.*) Following Ms. Shelton's note, nothing indicates that Mr. Abshire's vitals were assessed or that Defendants provided him the Optune Device, took him to a hospital, or transferred him to another facility. (*Id.* at ¶¶ 58–59.)

### E.  Mr. Abshire's Death

On September 11, 2021, at 8:55 p.m., medical staff was alerted that Mr. Abshire urinated himself. (*Id.* at ¶ 60.) However, Mr. Abshire was not taken to the hospital or assessed by a doctor. (*Id.* at ¶ 61.) Soon thereafter, he was found to be "passed out on the floor." (*Id.* at ¶ 62.) Footage from LPDC reveals that "Mr. Abshire collapsed while walking to obtain a food tray." (*Id.*) It was not until then that medical staff assessed Mr. Abshire's vitals and discovered that he had an irregular and highly erratic pulse. (*Id.* at ¶ 63.) Further, Mr. Abshire could not complete a pupil test, and he would respond inappropriately to questions posed to him. (*Id.*) At that point, LPDC's medical staff ordered that Mr. Abshire be taken to the hospital. (*Id.* at ¶ 64.)

Sheriff personnel transported Mr. Abshire to Our Lady of the Lake Hospital, and upon arrival to the hospital "when police transfer crew opened the van door, [Mr. Abshire] rolled out of the vehicle and fell hitting his head on the ground." (*Id.* at ¶¶ 65–66.) Medical staff at Our Lady of the Lake contacted LPDC's medical unit, and after doing so, Our Lady of the Lake noted in Mr. Abshire's medical file "that he is supposed to be wearing a radiation helmet. However, they have not been able to provide help with this since he has been in jail (since July)." (*Id.* at ¶ 67.) Mr. Abshire was transferred to Tulane Hospital, but his condition failed to improve. (*Id.* at ¶¶ 68–69.) He died on November 28, 2021. (*Id.* at ¶ 70.)

## II.    Relevant Standard

Dr. Taylor filed his motion under Federal Rule of Civil Procedure 12(b)(6). (Doc. 14.)  The

standard for such a motion was summarized the Court's prior ruling, and, again, there is no need

to restate that in full here. *See Abshire*, 2023 WL 2731040, at *11–13.  In sum:

> We accept all well-pleaded facts as true and view all facts in the
> light most favorable to the plaintiff. We need not, however, accept
> the plaintiff's legal conclusions as true. To survive dismissal, a
> plaintiff must plead enough facts to state a claim to relief that is
> plausible on its face. A claim has facial plausibility when the
> plaintiff pleads factual content that allows the court to draw the
> reasonable inference that the defendant is liable for the misconduct
> alleged. Our task, then, is to determine whether the plaintiff stated a
> legally cognizable claim that is plausible, not to evaluate the
> plaintiff's likelihood of success.

*Id.* at *13 (quoting *Thompson v. City of Waco, Tex.*, 764 F.3d 500, 502–03 (5th Cir. 2014) (internal

citations and quotations omitted)).

## III.    Discussion

### A.  Parties' Arguments

Dr. Taylor now seeks dismissal of the claims against him on the following grounds: (1)

Plaintiffs' state law claims are premature, as they sound in medical malpractice and thus should

be dismissed without prejudice until the medical review panel has rendered an opinion on them,

(Doc. 14-1 at 4–7); and (2) Dr. Taylor is entitled to qualified immunity because (a) he was not a

state actor acting under color of state law, (*id.* at 7), and (b) Plaintiffs have alleged no more than a

disagreement over medical treatment and negligence, neither of which rises to the level of

deliberate indifference, (*id.* at 7–10.)  Dr. Taylor also moves that the case be stayed pending a

review by the medical review panel. (*Id.* at 10–12.)

Plaintiffs respond: (1) they do not assert any state law medical malpractice claims against

Dr. Taylor, (Doc. 19 at 1); and (2) Dr. Taylor is not entitled to qualified immunity because (a)

qualified immunity conflicts with the original text of the Constitution, (*id.* at 2– 11); (b) Dr. Taylor

acted under color of state law when he harmed Mr. Abshire, (*id.* at 12–14); and (c) "Dr. Taylor

was deliberately indifferent as is evidenced by his refusal to treat Mr. Abshire, ignoring [his]

complaints, and refus[ing] to provide a necessary medical device," (*id.* at 14 (cleaned up); *see also*

*id.* at 14–16.)  Plaintiffs close by stating that Dr. Taylor's federal claim should not be stayed

because, again, it is not subject to the medical review panel. (*Id.* at 17–20.)

### B.  Preliminary Issues

#### 1. Alleged State-Law Claims

At the outset, the Court can dispose of some of Dr. Taylor's arguments with ease.  First,

this defendant urges dismissal of Plaintiffs' purported state law medical malpractice claim and a

stay during the pendency of the medical review panel, but the Court rejects this contention for two

reasons.  For one, it is questionable whether this is even a valid ground for staying a case like this.

*See Lockwood v. Our Lady of the Lake Hosp., Inc*., No. 17-509, 2018 WL 3451514, at *7 (M.D.

La. July 17, 2018) (Dick, C.J.) (stating that defendant hospital "offer[ed] no authority for its

argument that when federal and state law claims are so intertwined, the federal claims should be

dismissed" and also relying on and later quoting *Bernius v. Ochsner Medical Ctr.—North Shore,*

*L.L.C*., Civil Action No. 16-14730, 2016 WL 10586188, at *7 (E.D. La. Dec. 15, 2016) (Barbier,

J.) ("Requiring a Rehabilitation Act plaintiff to exhaust state administrative procedures would

stand in as an obstacle to the congressional intent of the Rehabilitation Act." (citing *Smith v. State*

*of Ind.*, 904 F. Supp. 877, 880 (N.D. Ind. 1995) (finding, in the ADA context, that "[t]he defendant

may not use the Indiana Medical Malpractice Act's requirement of presentation of claims to a

medical review panel as a means to trump the plaintiff's claim under federal law")))).

For two, as Plaintiffs argue in briefing, Dr. Taylor's position "presupposes that the instant claims are or will be sent to the Louisiana Medical Malpractice Panel – which it clearly has not." (Doc. 19 at 19.)  That is, "[a] stay is unnecessary and inappropriate because there are no claims to be sent to a Medical Malpractice Panel," (*id.* at 2). So, for this additional reason, Defendant's motion to stay and motion to dismiss state law claims against Dr. Taylor will be denied. *Cf. Lavignette v. W. Jefferson Med. Ctr.*, No. 89-5495, 1990 WL 178708, at *1 (E.D. La. Nov. 7, 1990) (granting a motion to stay a case brought under federal "Anti-dumping Act," "considering the effect of a positive outcome of a medical review panel's findings of the state medical malpractice claim against defendant Dr. Hamrick on plaintiff's federal claim against West Jefferson and in the interest of judicial economy").

### 2. "Under Color of Law"

Second, the Court easily rejects Dr. Taylor's contention that he was not acting under color of state law so as to fall under § 1983.  In short, Supreme Court precedent forecloses Dr. Taylor's argument.

Specifically, in *West v. Atkins*, 487 U.S. 42 (1988), the "question [was] whether a physician who is under contract with the State to provide medical services to inmates at a state-prison hospital on a part-time basis acts "under color of state law," within the meaning of 42 U.S.C. § 1983, when he treats an inmate." *Id.* at 43.  The Supreme Court held that he was, as "[s]uch conduct is fairly attributable to the State." *Id.* at 54.  Other circuits have followed suit. *See, e.g., Johnson v. Karnes*, 398 F.3d 868, 876 (6th Cir. 2005) ("private physicians serving inmate populations satisfy the state-action requirement of [§ 1983]" (citing *West*, 487 U.S. at 54–57)); *Farrow v. West*, 320 F.3d 1235, 1239 n.3 (11th Cir. 2003) ("a private physician . . . under contract with a state to provide medical care to inmates acts 'under color of state law' for purposes of section 1983 when undertaking his

9

duties' to treat an inmate." (quoting *Carswell v. Bay Cnty.*, 854 F.2d 454, 456–57 (11th Cir. 1988)

(quoting *West*, 487 U.S. at 54))). And, of course, § 1983 applies to those who work for local

governmental entities. *See Monell v. Dep't of Soc. Servs. of City of New York,* 436 U.S. 658, 690

(1978) ("Our analysis of the legislative history of the Civil Rights Act of 1871 compels the

conclusion that Congress *did* intend municipalities and other local government units to be included

among those persons to whom § 1983 applies."); *see also Adams v. WildHorse Res., LLC*, No. 11-

1453, 2012 WL 2992487, at *2 (W.D. La. June 25, 2012) ("Typical state actors [under § 1983] are

policemen, local government officials, and physicians such as the one in *West* who contract with

the state to provide medical services to inmates at a state facility."), *report and recommendation*

*adopted*, No. 11-1453, 2012 WL 2992486 (W.D. La. July 20, 2012).

Here, Plaintiffs specifically allege that Dr. Taylor was "the medical doctor appointed by

[the Parish] to serve as the physician for the [LPDC]." (Doc. 1 at ¶ 18.)  Thus, Dr. Taylor's

argument is wholly without merit, and this defendant can be liable if Plaintiffs can overcome

qualified immunity.

### C.  Qualified Immunity

#### 1. Applicable Law

"Qualified immunity provides government officials performing discretionary functions

with a shield against civil damages liability, so long as their actions could reasonably have been

thought consistent with the rights they are alleged to have violated." *Gobert v. Caldwell*, 463 F.3d

339, 345 (5th Cir. 2006) (citing *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)). "In determining

whether an official enjoys immunity, we ask (1) whether the plaintiff has demonstrated a violation

of a clearly established federal constitutional or statutory right and (2) whether the official's actions

violated that right to the extent that an objectively reasonable person would have known." *Id*.

(citing *Hope v. Pelzer*, 536 U.S. 730 (2002)). Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

As to the first prong, "a § 1983 cause of action asserting . . . a lack of proper inmate medical care requires 'deliberate indifference' to the prisoner's 'serious medical needs.' " *Young v. McCain*, 760 F. App'x 251, 256 (5th Cir. 2019) (per curiam) (quoting *Estelle v. Gamble*, 429 U.S. 97, 101–05 (1976) (internal quotation marks and citations omitted)); *see also Hare v. City of Corinth, Miss.*, 74 F.3d 633, 647–48 (5th Cir. 1996) (recognizing that deliberate indifference standard applies to episodic acts or omissions claims for convicted prisoners and pretrial detainees). To sufficiently demonstrate deliberate indifference, "Plaintiffs must show that the defendants were 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,' that the defendants actually 'dr[e]w the inference,' and that the defendants 'disregard[ed] that risk by failing to take reasonable measures to abate it.' " *Est. of Bonilla by & through Bonilla v. Orange Cnty., Tex.*, 982 F.3d 298, 305 (5th Cir. 2020) (quoting *Hyatt v. Thomas*, 843 F.3d 172, 177 (5th Cir. 2016) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994))).

"The 'extremely high standard' of deliberate indifference requires that prison officials 'refused to treat [the prisoner], ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.' " *Young*, 760 F. App'x at 256 (quoting *Domino v. Tex. Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001) (internal quotation marks and citations omitted)). "Allegations of unsuccessful medical treatment, negligence, neglect, medical malpractice, or a mistaken judgment do not amount to deliberate indifference to serious medical needs." *Id.* (citing *Varnado v. Lynaugh*,

11

920 F.2d 320, 321 (5th Cir. 1991)). " '[T]he decision whether to provide additional treatment is a classic example of a matter for medical judgment.' " *Id.* (quoting *Domino*, 239 F.3d at 756 (internal quotation marks and citation omitted)).

As to the second prong, "[q]ualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam) (alterations and internal quotation marks omitted)). "Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)).

"Although '[the Supreme] Court's caselaw does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate.' " *Id.* (quoting *White*, 137 S. Ct. at 551 (internal quotation marks omitted)). "In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (quoting *White*, 137 S. Ct. at 551 (internal quotations omitted)).

"Of course, general statements of the law are not inherently incapable of giving fair and clear warning to officers." *Id.* at 1153 (quoting *White*, 137 S. Ct. at 552 (internal quotation marks omitted)). "But . . . [a]n officer 'cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.' " *Id.* (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 778–79 (2014)).

Phrased another way, "[w]hen considering a defendant's entitlement to qualified immunity, [the Court] must ask whether the law so clearly and unambiguously prohibited his conduct that

'*every* reasonable official would understand that what he is doing violates [the law].' " *McLin v. Ard*, 866 F.3d 682, 695 (5th Cir. 2017) (citing *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (en banc) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011))). "To answer that question in the affirmative, we must be able to point to controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity." *Id.* (quoting *Morgan*, 659 F.3d at 371–72 (internal quotations omitted) (quoting *al-Kidd*, 563 U.S. at 742)). "Where no controlling authority specifically prohibits a defendant's conduct, and when the federal circuit courts are split on the issue, the law cannot be said to be clearly established." *Id.* (quoting *Morgan*, 659 F.3d at 372).

### 2. Analysis

Having carefully considered the matter, the Court will deny Taylor's motion.  In short, Plaintiff has overcome qualified immunity.

First, Mr. Abshire faced a substantial risk of harm.  The *Complaint* details Mr. Abshire's disability (glioblastoma multiforme tumor) and the significant danger that posed to him. (Doc. 1 ¶¶ 22–28.)  This element is not seriously disputed.

Second, the Court concludes that Plaintiffs sufficiently plead that Dr. Taylor was aware of a substantial risk of harm to Mr. Abshire.  Plaintiffs specifically allege how, when Abshire arrived at the jail, he "advised the medical staff of his cancer diagnosis and his need for the Optune Device." (*Id.* at ¶ 33.)  He completed a form explaining that he had a "terminal illness" and was "lucky to still be alive." (*Id.* at ¶ 34.)  The same day, Dr. Taylor spoke with Mr. Abshire's Tulane oncologist, where the doctor highlighted Mr. Abshire's need for the Optune Device, how long he should use it daily, and how his daughter would provide the device that day or the following one. (*Id.* at ¶ 35.)  As Plaintiffs correctly allege, "Quite simply, by July 20, 2021, [Dr. Taylor] and the

13

medical department knew that Mr. Abshire had cancer, needed the Optune Device, knew the duration that the device should be used each day, and knew the method of administration." (*Id.* at ¶ 37.)

Equally important, six days after Dr. Taylor communicated with the oncologist, Ms. Chaney provided a "staff response" to Mr. Abshire indicating that the prison could, "down the line," possibly transfer him to another facility "that [was] better able to treat [him] from a medical standpoint." (*Id.* at ¶ 39.)  Construing these allegations in a light most favorable to Plaintiffs (as the Court must), a reasonable inference from this exchange and from Dr. Taylor's discussion with the oncologist is that Dr. Taylor was in communication with medical staff about Mr. Abshire's condition and was aware of the notes Mr. Abshire provided.

Additionally, Plaintiffs allege that "Mr. Abshire's family made daily phone calls to the jail requesting that Mr. Abshire receive treatment via the Optune Device." (*Id.* at ¶ 45.)  The Court can also infer from this paragraph that Dr. Taylor was apprised of the situation.  All of these allegations demonstrate that Dr. Taylor had knowledge that Mr. Abshire faced a substantial risk of harm.[1]

And third, the Court also finds that Dr. Taylor acted with deliberate indifference in response to this knowledge.  The *Complaint* details how Mr. Abshire's family provided Defendants with the device, (*id.* at ¶ 40); how, despite this, Mr. Abshire was "never once provided the Optune Device," (*id.* at ¶ 38), or allowed to use the one his family brought, (*id.* at ¶ 41); and how his condition deteriorated without it until death, (*id.* at ¶¶ 42–70).  Further, a reasonable inference from Ms. Chaney's statement that Mr. Abshire would ultimately need a transfer is that Dr. Taylor

---

[1] Though Plaintiffs allege that "There is no indication that Ms. Kohler investigated Mr. Abshire's concerns that he was dying or reported the situation to her supervisor or defendant [Dr. Taylor]," (*id.* ¶ 52), an equally reasonable inference from this paragraph is that the medical records are silent on this point, not that Dr. Taylor was unaware completely of Mr. Abshire's deteriorating condition.  This interpretation is particularly reasonable in light of all of the other allegations, detailed above, reflecting Dr. Taylor's involvement in Mr. Abshire's treatment, and in light of the fact that the *Complaint* must be construed in a light most favorable to Plaintiffs, with reasonable inferences drawn in their favor. *See Abshire*, 2023 WL 2731040, at *11–13 (detailing standard for motions to dismiss).

(who communicated with Ms. Chaney) recognized that the appropriate response was to provide Mr. Abshire with the Optune Device, yet he failed to do so. (*See id.* at ¶ 39.)

The *Complaint* sets forth the justifications Defendants provided for denying the device to Mr. Abshire, but that pleading also demonstrates why these reasons are meritless.  The operative complaint alleges that Defendants did not allow Mr. Abshire to use the Optune Device because: (1) " 'the nurse [wa]s pregnant' and could not be around the device," (*id.* at ¶ 45); (2) the staff "didn't know how to use it," (*id.* at ¶ 46); and (3) according to one note, "[due to] the pandemic, [the prison was] unable to bring anyone in the facility to set it up for him," (*id.* at ¶ 56).

But the *Complaint* also explains how Mr. Abshire's family  "provided the medical staff with the instruction manual." (*Id.* at ¶ 46.)  A reasonable inference from this allegation is that the medical staff in place at the facility (consisting of more than a single, pregnant nurse) could have learned how to use Mr. Abshire's device.  Whether that fact ultimately proves true is irrelevant; for present purposes, the Court must accept it as true, and that is enough to warrant denial of Dr. Taylor's motion.

Critically, Dr. Taylor does not claim that this right was not clearly established; to the contrary, Dr. Taylor's sole argument is that Plaintiffs do no more than complain about a "disagreement . . . with the medical care chosen" and that this is mere "negligent medical treatment" or "medical malpractice." (Doc. 14-1 at 9–10.)

The Court disagrees; again, "deliberate indifference requires that prison officials refused to treat the prisoner, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Young*, 760 F. App'x at 256 (cleaned up).  Dr. Taylor's refusal to provide the Optune Device, despite full knowledge that Mr. Abshire needed it, is not mere negligence or malpractice; it is

deliberate indifference, and every reasonable officer would know, beyond debate, that this was the case. *See Conners v. Pohlmann*, No. 15-101, 2021 WL 1172534, at *4 (E.D. La. Mar. 29, 2021) (Barbier, J.) (finding that correctional officer's "argument that Plaintiffs have failed to state a claim because they only allege that [decedent] received inadequate medical treatment is unavailing, because Plaintiffs allege[d] that [the officer] ignored [the decedent's] complaints, [her superior] intentionally refused to provide [the decedent] with her medication and instead placed her on suicide watch, and [the officer] knew that [the superior] was refusing to provide the correct treatment); *Henderson v. LeBlanc*, No. 16-265, 2018 WL 2050149, at *15 (M.D. La. May 2, 2018) (deGravelles, J.) (denying nurse's motion to dismiss because "Plaintiff has alleged more than a mere delay [in medical treatment]. Rather, construing the allegations of the most recent complaint in a light most favorable to the Plaintiff and accepting them as true, [the] Nurse . . . refused treatment and intentionally obstructed Plaintiff's efforts to receive his medications[,]" and "[t]his amount[ed] to more than mere negligence or gross negligence." (citing *Magee v. Williams,* No. 16-0123, 2018 WL 1934072, at *1 (W.D. La. Apr. 24, 2018) (finding plaintiff's claim was not frivolous when he alleged, among other things, that medical providers "refused to provide appropriate treatment"))); *cf. Henderson*, 2018 WL 2050149, at *14 (granting in part motion to dismiss where the only allegation against doctor was that he was "the 'medical director of the R.E. Barrow Treatment Center' at LSP and 'has the responsibility to ensure all doctors provide adequate care to offenders, including HIV positive offenders' like the Plaintiff" because "Plaintiff provides no specific allegations of any wrongdoing by [doctor] that would rise to the level of deliberate indifference; Plaintiff's claims against [the doctor] amount to little more than allegations of vicarious liability, which, again, is barred by § 1983." (citation omitted)). As a result, Dr. Taylor's motion will be denied.

### D. Qualified Immunity

The Court notes in closing that Plaintiffs make an impassioned argument that qualified immunity is unconstitutional. (Doc. 19 at 2-11.)  That position certainly finds some support within the Fifth Circuit. *See Zadeh v. Robinson*, 928 F.3d 457, 480–81 (5th Cir. 2019) (Willett, J., dissenting in part) ("Indeed, it's curious how this entrenched, judge-created doctrine excuses constitutional violations by limiting the statute Congress passed to redress constitutional violations. . . . But even if qualified immunity continues its forward march and avoids sweeping reconsideration, it certainly merits a refined procedural approach that more smartly—and fairly—serves its intended objectives.").  Indeed, in *Rogers v. Jarrett*, 63 F.4th 971 (5th Cir. 2023), Judge Willett wrote "separately only to highlight newly published scholarship that paints the qualified-immunity doctrine as flawed—foundationally—from its inception." *Id.* at 979 (Willett, J., concurring) (citing Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*, 111 Cal. L. Rev. 201 (2023)).  In doing so, Judge Willett discussed the same article the instant Plaintiffs "rel[y] substantially on" in their brief. (*See* Doc. 19 at 2 n.1; *see also Rogers*, 64 F.4th 979 n.1).

Nevertheless, this Court's own feelings toward qualified immunity are ultimately irrelevant; Plaintiffs' arguments are best left for the Supreme Court or the Fifth Circuit sitting en banc, not for a district court.  *See Planned Parenthood of Greater Tex. Fam. Plan. & Preventative Health Servs., Inc. v. Kauffman*, 981 F.3d 347, 369 (5th Cir. 2020) ("It is a well-settled Fifth Circuit rule of orderliness that one panel of our court may not overturn another panel's decision, absent an intervening change in the law, such as by a statutory amendment, or the Supreme Court, or our en banc court." (quoting *Jacobs v. Nat'l Drug Intel. Ctr.*, 548 F.3d 375, 378 (5th Cir. 2008) (emphasis omitted)); *see also Conners*, 2021 WL 1172534, at *5 ("declin[ing] Plaintiffs invitation to find that" the Supreme Court overruled the doctrine of qualified immunity "implicitly" (citing *Nat'l*

*Coal. for Men v. Selective Serv. Sys.*, 969 F.3d 546, 550 (5th Cir. 2020) ("[L]ower courts may not 'conclude [that] recent cases have, by implication, overruled an earlier precedent.' ") (quoting *Agostini v. Felton*, 521 U.S. 203, 237 (1997))).   Or, as Judge Willett said, "Today's decision upholding qualified immunity is compelled by our controlling precedent." *Rogers*, 63 F.4th at 979 (Willett, J., concurring).   Accordingly, the Court rejects Plaintiffs' attempt to invalidate the doctrine of qualified immunity.

**IV.    Conclusion**

Accordingly,

**IT IS ORDERED** that the *Rule 12(b)(6) Motion to Dismiss and to Stay by Defendant, Dr. James Taylor* (Doc. 14) is **DENIED**.

Signed in Baton Rouge, Louisiana, on <u>May 22, 2023</u>.

_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

18